[No. D019310. Fourth Dist., Div. One. July 20, 1994.]

ANNE RIZZO et al., Plaintiffs and Appellants, v.
BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY
SYSTEM et al., Defendants and Respondents;
ASSOCIATED STUDENTS, SAN DIEGO STATE UNIVERSITY,
Intervener and Respondent.

854

**COUNSEL**

D. Dwight Worden and Crystal Crawford for Plaintiffs and Appellants.

Lee R. Rydalch and Richard Ceccia for Defendants and Respondents.

Hinchy, Witte, Wood, Anderson & Hodges, A. Kendall Wood and David D. Cross for Intervener and Respondent.

## OPINION

**WORK, Acting P. J.**—Anne Rizzo and Thomas Thai appeal a summary judgment entered against them in favor of defendants the Board of Trustees of the California State University System, Barry Munitz, Chancellor of the California State University System, and Thomas Day, President of San Diego State University, and intervener Associated Students, San Diego State University.

In 1969, the California State University System (CSU) built a student union facility, Aztec Center, at San Diego State University (SDSU). The project was underwritten by revenue bonds (Series A bonds) issued pursuant to the State University Revenue Bond Act of 1947 (1947 Bond Act). (Ed. Code,[1] § 90010 et seq.) CSU now proposes to construct a Student Activity Center (SAC) at SDSU. The SAC is to be underwritten by Series B bonds issued pursuant to the 1947 Bond Act. The Series B bonds are to be serviced by a portion of mandatory student union fees levied on all students. The fees are currently set at $126 per year. Increased fees dedicated to the SAC have been collected from SDSU students since 1988 and are to be collected in the future. The Series B bonds for the construction of the SAC have yet to be issued. In this declaratory relief action, two SDSU students, Rizzo and Thai (collectively Rizzo), seek a declaration the portion of the fees dedicated to the SAC is illegal.

In this opinion, we interpret certain sections of the Education Code to determine whether the SAC fees already levied and those to be levied in the future are allowed under the law. Section 89304 provides that a building and operating fee of not more than $40 may be imposed on all students under certain conditions while the 1947 Bond Act in section 90068 provides that where bonds have been issued, fees for the use of any project may be set in an amount necessary to maintain the project and service the debt. We conclude that once bonds are issued and outstanding under the 1947 Bond Act, as is the case here with the Series A bonds, the section 89304 fee limitation no longer applies and flat fees may be assessed against all students in an amount necessary to maintain the project and service the debt. We therefore affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

SDSU's first student body center, Aztec Center, was built in 1969 and currently provides services. Before Aztec Center was built, a special student election was held in 1963 in which more than two-thirds of the students

---

[1]All statutory references are to the Education Code unless otherwise specified.

voting approved construction of the center, issuance of up to $3 million in bonds under the 1947 Bond Act to fund construction, and establishment of a student building and operating fee not to exceed $20 annually. Pursuant to executive order of the chancellor, CSU collected student fees in accordance with former sections 23804 and 23805 (predecessor sections to current §§ 89303, 89304).

By resolution dated April 28, 1968 (1968 Resolution), the Trustees of the California State Colleges (now denominated Trustees of the California State University System) (hereafter Trustees) authorized the initial issuance of Series A Student Union Revenue Bonds not to exceed $2,940,000 that were to be used to fund construction of Aztec Center. The 1968 Resolution also provides the Trustees may by supplemental resolution establish other series of bonds to provide for additional projects. Series A bonds were later sold pursuant to the 1968 Resolution with the last bonds to mature in the year 2006.

Over the next several years, the chancellor through executive orders set student body center fees (hereafter student union fees) for SDSU students. The executive orders provided the fees were charged pursuant to provisions of the 1947 Bond Act, specifically sections 90012, subdivision (c), 90068 or their predecessor sections. In response to student concerns that fees might be increased without a student referendum, the chancellor's office in 1985 issued a policy and procedure statement providing for an advisory majority vote of students before a campus seeks to materially increase fees to expand a program or facility.

By the 1980's, various proposals surfaced to expand Aztec Center or to build an additional facility. In January 1987, a facility planning committee was established to develop, evaluate and propose recommendations to the governing body of the SDSU Associated Students (AS) and university administration. The planning committee recommended constructing a recreational/special events facility to be used for student recreation, student-sponsored events including concerts and lectures, intercollegiate athletics and academic instruction.

In March 1988, SDSU students participated in an advisory referendum conducted by the AS on whether the SAC should be built and whether student union fees should be increased for that purpose. The ballot described the SAC as including student recreational facilities for intramurals, sports clubs, leisure programs, weight training and fitness activities, and a 10,000-seat special events arena for concerts, lectures and athletic events. The ballot stated the project would be financed through increased student union fees set

at $62 for academic year 1988, $82 for 1989, and $126 for 1990 and subsequent years. Of the students voting, 65 percent voted in favor of the SAC and the increase in fees. The AS governing board unanimously passed a resolution endorsing the results of the referendum and authorizing the SDSU president to request an increase in student union fees.

On May 16, 1988, CSU's chancellor, pursuant to sections 90012, subdivision (c), and 90068, issued Executive Order No. 529 establishing SDSU student union fees in accordance with those set forth in the advisory referendum ballot. Since the fall of 1988, fees have been collected from all SDSU students pursuant to the fee schedule. Preliminary work on the SAC, including architectural and engineering work and preparation of environmental impact reports, proceeded.

Community groups challenged the environmental impact reports under the California Environmental Quality Act. (Pub. Resources Code, § 21000 et seq.) Eventually, a supplemental environmental impact report was upheld by this court. (*Alvarado Estates Community Association* v. *Trustees of California State University* (May 29, 1992) D015175 [nonpub. opn.].) Additionally, as a result of a state budget crisis, substantial cuts were imposed on SDSU starting in 1989. A number of students and faculty asked that the SAC be reevaluated in light of the fiscal crisis, questioning the allocation of millions of dollars to a sports arena and related facilities when academic programs were being severely cut.

Nevertheless, on September 11, 1991, the Trustees adopted a first supplemental resolution approving issuance of SDSU student union revenue bonds, Series B, not to exceed $33.5 million. The bonds are to finance the construction of a multipurpose recreational facility totaling 62,350 square feet including a 12,000-seat sports arena and athletic offices. Sale of Series B bonds was scheduled for July 9, 1992, but was later suspended pending resolution of this lawsuit.

In July 1992, Rizzo filed this action against the Trustees, CSU chancellor and SDSU president. The complaint, inter alia, sought declaratory relief (1) the student body center fees for the SAC were illegal and the only fees that could be imposed on all students were those approved in advance by a two-thirds vote of the students, but not to exceed $40 as required by section 89304; (2) the 1947 Bond Act applies to authorize the charging of true "user fees" only; and (3) the fees already collected were illegal and must be

reallocated to educational or other programs as authorized by law or re-funded to the students. The defendants'[2] demurrer to the complaint was overruled. AS intervened on the side of CSU.

By agreement of the parties, the case was set for resolution by simulta-neous cross-motions for summary judgment and summary adjudication on the issue of the legality of the fees. The court granted CSU's and AS's motions for summary judgment and denied Rizzo's motion for summary adjudication. The court found the limitations of section 89304 did not apply to the grant of authority to charge fees contained in the 1947 Bond Act.

Judgment was entered and Rizzo timely filed a notice of appeal. The parties in their initial briefs addressed whether the section 89304 flat fee limitation applied to limit the Trustees' ability under the 1947 Bond Act to impose mandatory flat fees on all students and whether fees imposed under the 1947 Bond Act were limited to true "user" fees. We requested supple-mental briefing from all parties on the effect of the SAC student fees having been imposed before the issuance of the Series B bonds.

DISCUSSION

I

We are called upon to determine how certain sections of the Education Code affect the imposition of student union fees. The sections primarily in issue are sections 89303, 89304, 90012, subdivision (c), and 90068, the last two sections being provisions of the 1947 Bond Act.

*The Sections in Question*

Under section 89303, the Trustees "may provide" for the construction of a student body center pursuant to the 1947 Bond Act, financed entirely or in part by student fees authorized in section 89304.[3] Section 89304 authorizes the Trustees to fix an annual building and operating fee not to exceed $40 to

---

[2]"CSU" hereafter collectively refers to all defendants unless otherwise required by the context of the text.

[3]Section 89303 provides: "The trustees may provide for the construction of a building to serve as a student body center to be financed entirely or in part by fees required of students as authorized in Section 89304 pursuant to the provisions of the State University Revenue Bond Act of 1947."

be imposed upon all students attending a state university providing imposition of the fee has previously been approved by two-thirds of the students voting in an election held for that purpose.[4]

Under the 1947 Bond Act, the Trustees have the power to fix, change or modify rates, rents or charges for the use of any project constructed pursuant to the act subject to any contractual obligations entered into by the Trustees. (§ 90012, subd. (c).)[5] The 1947 Bond Act further requires the Trustees to fix rents, charges and fees "for the use" of the projects "by any persons utilizing the facilities" subject to contractual obligations between the Trustees and the holders of notes and bonds. (§ 90068.)[6] Moreover, the Trustees may change rents, charges and fees as conditions warrant and shall fix those charges to yield annual revenue equal to annual operating and maintenance expenses including expenses necessary to service the issued and outstanding bonds. (*Ibid.*)

*The Parties' Positions in Their Initial Briefs*

 Rizzo contends the Education Code sections must be harmonized and read together so that any flat fees imposed on all students, irrespective of their use of the SAC, are subject to the $40 cap and the two-thirds vote requirement of section 89304 and that any fees in excess of those allowed

---

[4]Section 89304 provides in pertinent part: "Upon the favorable vote of two-thirds of the students voting in an election held for the purpose at a state university, in the manner the trustees shall prescribe, and open to all regular students enrolled in the state university, the trustees are authorized to fix, in addition to any other student fee the trustees are authorized to fix, a building and operating fee not to exceed forty dollars ($40) per student per academic year which shall be required of all students attending the state university. All unexpended funds and money collected by any state university under this section shall be available for financing, operating, and constructing a student body center, and until so used, shall, . . . be deposited or invested in trust . . . ."

[5]Section 90012, subdivision (c), provides the Trustees have the power: "To fix rates, rents or other charges for the use of any project acquired, constructed, equipped, furnished, operated or maintained by the [Trustees], or for services rendered in connection therewith, and to alter, change or modify the same at [their] pleasure, subject to any contractual obligation which may be entered into by the [Trustees] with respect to the fixing of rates, rents or charges."

[6]Section 90068 provides: "The [Trustees] shall fix rents, charges and fees for all projects acquired, constructed or completed under the terms of this article for the use thereof by any persons utilizing the facilities thereof, subject to such contractual obligations as may be entered into by the [Trustees] and the holders of notes and bonds issued under this article. The [Trustees are] authorized to change rents, charges and fees from time to time, as conditions warrant. To the extent and in the manner provided in the indenture, all rents, charges and fees shall at all times be fixed to yield annual revenue equal to annual operating and maintenance expenses, including repairs and insurance costs and all redemption payments and interest charges and reserve fund requirements on revenue bonds at any time issued and outstanding hereunder, as the same become due."

under section 89304 must be in the form of true "user" fees provided for under section 90068, e.g., ticket surcharges and admission charges. Because the only SDSU student body center vote passing by the required two-thirds margin authorized a maximum $20 fee, Rizzo contends CSU has violated sections 89303 and 89304 which are clear on their face and must be interpreted and enforced according to their plain meaning.

CSU and AS on the other hand contend the authorizing statutes are separate and distinct and the authority to collect student union fees pursuant to Executive Order No. 529 stems from the 1947 Bond Act, not sections 89303 and 89304. CSU and AS contend sections 89303 and 89304 are a means to initially collect funds for campuses which have not yet constructed a student union facility and issued bonds. Once bonds have been issued, however, CSU and AS contend the Trustees charge fees pursuant to the 1947 Bond Act and are limited in the fees they may impose only by contractual obligations between the Trustees and the bondholders. (§ 90068.) CSU and AS argue their position is supported by the plain meaning of the statutes, legislative history and long-standing administrative interpretation of the statutes.

There being no questions raised with respect to any triable material issues of fact and the issues raised being strictly legal in nature, we review the construction of the statutes "de novo." (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].)

*Rules of Statutory Construction*

Rules of statutory construction require a court to ascertain the intent of the Legislature to effectuate the purpose of the law. (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 17-18 [194 Cal.Rptr. 722].) The provision must be given a reasonable interpretation consistent with its apparent purpose and the lawmakers' intention which will result in wise policy. (*Id.* at p. 18.) If possible, significance should be given to every word, sentence or part of the act and the parts harmonized, considering the clause or section in the context of the whole statutory framework. (*Ibid.*) The court should take into account context, object of the legislation, evils to be remedied, surrounding history, legislation upon the same subject, public policy and contemporaneous construction. (*Ibid.*)

Long-standing, consistent administrative construction of a statute by those charged with its administration, particularly where interested parties have acquiesced in the interpretation, is entitled to great weight and should not be disturbed unless clearly erroneous. (*DeYoung* v. *City of San Diego*,

*supra*, 147 Cal.App.3d at p. 18; see also *Nelson* v. *Dean* (1946) 27 Cal.2d 873, 880-881 [168 P.2d 16, 168 A.L.R. 467]; *Thornton* v. *Carlson* (1992) 4 Cal.App.4th 1249, 1256-1257 [6 Cal.Rptr.2d 375].) Opinions of the administrative agency's counsel construing the statute are likewise entitled to consideration. (*DeYoung* v. *City of San Diego, supra,* 147 Cal.App.3d at p. 18.) Numerous transactions are likely to have been entered into in reliance on long-standing interpretations and to invalidate the interpretation would require major readjustments and create extensive litigation. (*Nelson* v. *Dean, supra,* 27 Cal.2d at p. 881.) "[L]awmakers are presumed to be aware of long-standing administrative practice and, thus, the reenactment of a provision, or the failure to substantially modify a provision, is a strong indication the administrative practice was consistent with underlying legislative intent." (*DeYoung* v. *City of San Diego, supra,* 147 Cal.App.3d at pp. 18-19.) However, administrative officers may not make rules that alter or enlarge the legislation and an erroneous administrative construction does not govern the court's interpretation of the statute even where the statute has been subsequently reenacted without change. (*Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757-758 [151 P.2d 233, 155 A.L.R. 405].)

*Administrative Construction of Statutes*

The Trustees are responsible for administering the provisions of the Education Code within the CSU system. (§ 66606.) The Trustees by standing order have delegated their authority to assess and change student union fees to the chancellor. Since at least 1970, the chancellor has issued executive orders setting compulsory student body center fee schedules which specifically state that where a student union has been financed in whole or in part through the proceeds of revenue bonds issued and sold pursuant to the 1947 Bond Act, student fees will no longer be collected pursuant to sections 23804 and 23805 (predecessor sections to §§ 89303, 89304), but will be charged pursuant to section 24556 (predecessor section to § 90068).

According to the February 18, 1993, declaration of John S. Hillyard, CSU Assistant Vice-chancellor, Auxiliary and Business Services (ABS), submitted in support of CSU's motion for summary judgment, the Trustees have issued revenue bonds pursuant to the 1947 Bond Act on 19 CSU campuses for $112,385,000 of which $78,355,000 were then outstanding. Hillyard additionally declared that between the summer of 1970 and the fall of 1992 the chancellor issued 81 executive orders under the 1947 Bond Act setting student fees. Of those executive orders, 73 authorized implementation of fee schedules in excess of the then current fee cap of section 89304 or its predecessor section 23805.

In 1966, CSU's then chief of ABS requested an opinion from Norman Epstein, CSU's then chief counsel, on whether the fee cap set forth in former

section 23805, then set at $20, limited the student fees that could be charged for an operating student union constructed pursuant to the 1947 Bond Act. Epstein concluded:

"In our opinion, Section 23804 [predecessor to section 89303] does not effectively limit the amount of annual fees, provided that the student union facility has been constructed and is in operation and available to all students from whom a fee will be charged.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"We are aware that to date all state colleges actively proposing to have a student union have held elections which have satisfied the provisions of Education Code Sections 23804 and 23805 [predecessor to section 89304]. While the latter section authorizes the use of the money collected for operation of the facility, we do not believe these elections or the statute prohibits the use of other fee-authorizing authority, once the facility is established.

"In summary, the Garrigus Bill (Education Code Sections 23804 and 23805) authorizes the exaction and collection of student body center fee during the period prior to the completion and actual operation of the facility contemplated. The amount of that fee may not exceed $20 per calendar year per student. If the facilities are constructed pursuant to the State College Revenue Bond Act of 1947, that Act authorizes the Trustees, without approval of other agencies, to charge whatever amounts they establish for services provided, and further authorizes the Trustees to bind themselves to establish fees and charges at a rate sufficient to service the bonded indebtedness and to efficiently operate the facility."

The Trustees covenanted in the initial 1968 resolution (authorizing the issuance of the Series A bonds and providing for supplemental resolution to establish other series of bonds) that: "So long as any of the Bonds are outstanding, the Trustees shall levy student union fees against each student enrolled at San Diego State College, which fees shall be in amounts sufficient, together with any other Net Revenues, to provide for the payment of the debt service on the Bonds . . . [and] for the payment of the cost of maintaining and operating the Union."

In 1975, Mayer Chapman, then General Counsel for CSU, provided a memorandum to presidents of all CSU campuses in which he reiterated the authority for charging fees was initially found in section 23805 (predecessor section to § 89304) which was applicable before the actual sale of bonds.

Once revenue bonds for actual construction had been issued and sold under the 1947 Bond Act, however, he opined student union fees were no longer collected under section 23805, but instead were collected pursuant to section 24556 (predecessor section to § 90068) which provided, without any fee limitation, for charging fees to cover debt service and proper maintenance and operation of the facility.

CSU additionally obtained at least one opinion from bond counsel as to the application of the statutes. In 1978, Orrick, Herrington, Rowley & Sutcliffe, provided an opinion letter to CSU which affirmed CSU's interpretation of its authority to assess student union fees against all students under the 1947 Bond Act. Bond counsel also concluded that, once a campus had constructed a student union and had revenue bond issues outstanding, sections 89303 and 89304 did not require a student election to authorize the construction of an addition to the existing student union or an additional student facility or the issuance of revenue bonds under the 1947 Bond Act to provide funds for the construction of such facility.

Material found in the legislative history files on amendments and proposed amendments to section 89304 and its predecessor also support CSU's claim of its long-standing interpretation of its authority to assess mandatory student fees. On April 7, 1972, James Jensen, CSU Director of Governmental Affairs, wrote to Assemblyman Kenneth Maddy, sponsor of Assembly Bill No. 403 which would have increased the student union fee limitation in former section 23805 from $20 to $30, opposing the proposed legislation. The letter stated the Trustees did not consider the increase to be necessary, because existing and proposed facilities were financially viable under the existing cap and the provisions of "Bond indenture for college unions in operation" already provided student union fees may be levied in any amount necessary to pay debt service and reasonably maintain the structures. Mayer Chapman's May 30, 1975, memorandum to all presidents regarding the charging of fees is found in the Governor's chartered bill file on Assembly Bill No. 2001, which proposed to increase the former section 23805 fee cap from $20 to $40. In 1985, when section 89304 was finally amended to increase its fee cap from $20 to $40, the legislative history files for Senate Bill No. 350 sponsored by Senator Ralph Dills contain at least three letters from the California State Student Association to either Senator Dills or Senator Alfred Alquist, Chairman of the Senate Appropriations Committee, which specifically discuss the CSU interpretation that the fee cap of section 89304 only applied until bonds to construct the facilities were secured. The letters notified the senators current fees ranged as high as $65 per year and one letter submitted a fact sheet showing 16 campuses with fees in excess of the then $20 cap per annum.

It is clear that from at least 1966, CSU's counsel has interpreted sections 89303 and 89304 or their predecessor sections as limiting student union fees that can be charged to all students only until bonds have been issued under the 1947 Bond Act and the initial student union facility built at a particular campus. Once bonds have been issued, CSU's counsel has consistently found fees may be charged under section 90068 or its predecessor section against all students in any amount necessary to service the bonds and maintain the facility. Since at least 1968 and 1970 respectively, CSU has acted consistent with its counsel's opinion in adopting resolutions authorizing the issuance of revenue bonds pursuant to the 1947 Bond Act and in setting student union fees.

CSU has funded construction of student unions and related facilities by issuing revenue bonds and entering into agreements with bondholders based on an interpretation of its authority in existence for almost 30 years. This is the long-standing, consistent administrative interpretation of an agency's authority that should not be disturbed unless it is clearly erroneous.

*Is CSU's Interpretation Clearly Erroneous?*

Section 89303 states the Trustees "may provide" for construction of a student union center financed in whole or in part by student fees authorized in section 89304. Section 89304 authorizes the Trustees to fix a building and operating fee required of all students not to exceed $40. The section specifically provides the fees are "in addition to any other student fee the trustees are authorized to fix." The sections are permissive and in addition to any other authority the Trustees may have to impose fees. The sections do not preclude the Trustees from imposing a flat fee on all students without regard to the section 89304 cap, providing the Trustees have other authority to do so.

The powers granted the Trustees under the 1947 Bond Act are generally described in section 90012 and include the power to fix "rates, rents or other charges for the use of any project" (§ 90012, subd. (c)), to change or modify the charges "at [their] pleasure" subject to contractual obligations (*ibid.*), to covenant to increase rates or charges as necessary pursuant to contracts or agreements between bondholders and the Trustees (§ 90012, subd. (d)), to issue revenue bonds to raise funds necessary for any project (§ 90012, subd. (e)), and to adopt rules and regulations necessary to exercise their powers and perform their duties (§ 90012, subd. (g)). Section 90016 grants the Trustees authority to pledge revenues of the project to support bonds to the extent provided by the resolution pursuant to which the bonds were issued, while section 90051 allows the Trustees to provide that bonds shall be

secured by and shall constitute a lien on the revenues of the project. "Revenues" is defined in section 90011, subdivision (f), to include "any and all fees, rates, rentals, and other charges received or receivable in connection with . . . a project . . . ." Section 90068 requires that in the manner provided in the resolution all "rents, charges and fees" shall be fixed to yield revenues sufficient to meet operating and maintenance expenses including debt service.

It is clear under the cited sections, once bonds have been issued, the Trustees have a duty and responsibility to protect the interests of the bondholders established in the resolutions authorizing the issuance of the bonds. The power necessary to fulfill the Trustee's responsibility is extremely broad[7] and without question includes the authority to impose fees on students to meet obligations to bondholders.

Rizzo recognizes this authority, but contends the 1947 Bond Act allows the Trustees to impose only "true user" fees such as ticket surcharges or admission charges. Rizzo relies on the wording in section 90068 with respect to fees being fixed for the "use" of a project by "any persons utilizing the facilities" and a fair reading of the entire 1947 Bond Act. We conclude that when the history and purpose of the 1947 Bond Act are considered in conjunction with the nature of student unions and student activities facilities, the Trustees' authority is not so limited.

The 1947 Bond Act as initially enacted, defined "projects" to include "dormitories or other housing facilities or boarding facilities . . . ." (Stats. 1947, ch. 1153, § 1, p. 2611.)[8] In 1959, the Legislature passed urgency legislation amending the definition of the term "project" to include "student union or activity facilities, vehicle parking facilities or any other auxiliary or supplementary facilities for individual or group accommodation . . . ." (Stats. 1959, ch. 1517, § 1, p. 3808.) The pertinent wording of section 90068 and its predecessor section has remained constant since 1947.

Rizzo argues the only reasonable interpretation of section 90068 is that which has been traditionally applied when dormitories or parking facilities have been constructed with funds generated by revenue bonds, i.e. the

---

[7]The Trustees' duty to the bondholder is further evidenced by provisions throughout the 1947 Bond Act allowing the Trustees to include clauses in resolutions issuing bonds requiring the Trustees: (1) to operate the project continuously (§ 90022); (2) to maintain the project in good repair (§ 90023); (3) to fix and collect "rates, rentals or other charges in connection with the services and facilities furnished from the project" sufficient to pay the principal and interest on the bonds (§ 90027); and, (4) to prohibit free use of a project (§ 90071).

[8]Former section 20542 repealed in 1959, reenacted as section 24502, repealed in 1976, now section 90011.

students either living in the dormitories or parking in the parking facilities pay for their use. However, unlike dormitories and parking facilities, student unions and other student activity facilities do not necessarily lend themselves to fees being imposed directly upon the "users."

The use of dormitories and parking facilities has traditionally been exclusive. The exclusive use of such facilities is easily regulated through the imposition of rents for rooms occupied and the use of parking meters or parking permits. Student union facilities on the other hand generally are open to all students choosing to use them. While some student facilities and activities may lend themselves to direct charges, many do not. A student union is a gathering place available to all students. To police the facility and charge for its use in a manner requiring the exclusion of some students would be impractical and defeat the purpose of providing a student union. Moreover, student unions and student recreational and athletic facilities do not just benefit those students who avail themselves of their opportunities to use the facilities, but benefit all students through the enhanced public image and prestige of the school. Students are not only benefited while they are students, but continue to be benefited as alumni through the school's enhanced image and their ability to use the facility when they visit.

Statutes should be interpreted to produce reasonable results and words should be interpreted to "promote rather than defeat" the law's purpose and policy. (*Granberry* v. *Islay Investments* (1984) 161 Cal.App.3d 382, 388 [207 Cal.Rptr. 652].) With the nature of student unions and student recreational facilities and the purpose of the statute in mind, we therefore examine the wording of section 90068.

The section requires the Trustees to fix fees for the use of a project by persons utilizing the facility; it does not, however, specify who must pay the fees or how the fees must be allocated. While the reasonable method with facilities such as dormitories and parking facilities is to impose the fee on the "exclusive" users of the facilities in accordance with their actual use, such is not the case with student union facilities where the facility is available for use by all students and imposition of "use" charges is not necessarily practicable or advisable.[9] Under these circumstances, a reasonable interpretation of section 90068 is that fees may be imposed based on the facilities availability for use; i.e. Trustees shall fix fees necessary to pay for

[9]According to deposition testimony of Hillyard, revenue bonds issued under the 1947 Bond Act for the construction of health centers are also serviced by flat fees. In the case of health centers, the fees are imposed on all students within the CSU system. Fees for construction of student health care centers are provided for generally under section 89700 and specifically under section 89702.

the use of the facility by students choosing to use it and impose such fees against all students to whom the facility is available for use. Such interpretation is consistent with the nature of the facilities offered and with the broad grant of authority to the Trustees to protect the bondholders under the 1947 Bond Act.[10]

*Legislative Intent and History*

■ The implied repeal or contradiction of one statute by another is disfavored and will be recognized only where the statutes are wholly irreconcilable. (*Rodriguez* v. *Solis* (1991) 1 Cal.App.4th 495, 504 [2 Cal.Rptr.2d 50].) Rizzo contends that CSU's interpretation of the statutes results in section 89304 being effectively repealed or superseded, when it is clear the Legislature had no such intent. We disagree.

Allowing the imposition of flat fees on students under section 90068 does not effectively repeal section 89304 limitations. It is only where bonds have actually been issued and are outstanding that the Trustees are allowed to impose fees under section 90068. While the bonds are outstanding section 90068 requires those fees be sufficient to service the outstanding debt and maintain the facility. The flat fee limitation of section 89304, however, remains in effect and precludes the Trustees from imposing any flat fee in excess of that allowed by section 89304 at any campus where revenue bonds are not outstanding.

Statutes relating to the same subject matter should be read together in a manner that harmonizes them whenever possible. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) Rizzo argues the only way to harmonize the statutes and give meaning to both is to impose the limitations of section 89304 to all flat fees and to allow the imposition of true "user" fees only under section 90068 without regard to the section 89304 limitations. Rizzo contends its interpretation is the only one supported by the history and wording of the statutes and that CSU's and AS's argument the statutes provide separate and distinct avenues for imposing fees is without support in the statutes' wording or history.

---

[10]Rizzo cites an Attorney General opinion finding state statutes preclude charging community college students flat fees to construct a student union facility. The Community College Bond Act of 1961 (Community College Bond Act) is fashioned on the 1947 Bond Act with sections 81903, subdivision (c) and 81956 containing virtually identical wording to sections 90012, subdivision (c), and 90068 respectively. Without any analysis, the Attorney General concluded the Community College Bond Act (§§ 81903, subd. (c), 81956) allowed only fees for the "use" of a facility as opposed to mandatory flat fees imposed as a condition of enrollment. (60 Ops.Cal.Atty.Gen. 353 (1977).) As discussed in the body of the opinion, we disagree with the Attorney General's position.

Rizzo specifically argues the timing of adoption of the predecessor statutes to sections 89303 and 89304 establishes the Legislature adopted the limitations in response to the addition of student unions to the authorized project list in the 1947 Bond Act. Our review of the legislative history does not support Rizzo's position.

Student unions and activity facilities were added to the authorized projects under the 1947 Bond Act as an urgency measure, taking effect immediately upon filing with the Secretary of State on July 6, 1959. (Stats. 1959, ch. 1517, p. 3807, § 1, p. 3808.) It was not until April 21, 1961, almost two years later, that Assembly Bill No. 2913 seeking to add sections 23804 and 23805 (predecessor sections to §§ 89303, 89304) to the Education Code was introduced by Assemblymen Garrigus and DeLotto. (Assem. Bill No. 2913 introduced, Apr. 21, 1961, Assem. Final Hist. (1961 Reg. Sess.) p. 815.) The Garrigus Bill was ultimately passed and signed by the Governor on July 14, 1961. (Stats. 1961, ch. 1750, p. 3756.) Rizzo directs our attention to nothing, nor have we located anything, in the legislative history of the Garrigus Bill that would indicate the bill was a "response" to the 1947 Bond Act two years earlier being amended to include student unions as "projects."

Rather, section 23804 provided that the Trustees could provide for the construction of a student body center financed entirely or in part by fees authorized by section 23805 either (1) pursuant to the 1947 Bond Act, or (2) through authorizing a student body organization meeting certain criteria to finance and construct such facility. (Stats. 1961, ch. 1750, § 1, pp. 3756-3757.) The requirement for project approval by two-thirds of the students voting applied only to student body financing. (Stats. 1961, ch. 1750, § 1, p. 3757.) Section 23805 authorizing the Trustees to fix a building and operating fee not to exceed $20 applied where student body organizations were authorized to construct the center. (Stats. 1961, ch. 1750, § 2, p. 3757.) The objective of the legislation appears to have been to authorize student body organizations to finance and construct student body centers. (See, e.g., Legis. Counsel's Dig., Assem. Bill No. 2913 (1961 Reg. Sess.); Rep. Cal. Legis. Counsel, Assem. Bill No. 2913 (1961 Reg. Sess.).) It was not until 1969, that the provisions authorizing student body organizations to finance construction of student body centers were deleted from the statutes. (Stats. 1969, ch. 1106, § 1, p. 2111.)

Rizzo also contends the wording of section 89303 referring both to fees authorized by section 89304 and the 1947 Bond Act demonstrates its statutory interpretation must prevail. We disagree. The reference to the 1947 Bond Act in the section refers to the means by which bonds may be sold for the construction of a student body center. The reference to section 89304

provides *a means* for financing the construction, *either in whole or in part.* The reference to section 89304 does not deal with how, if bonds are issued pursuant to the 1947 Bond Act, they will be serviced. Instead, the 1947 Bond Act itself deals with its obligation to bondholders and how the bonds will be paid.

Rizzo additionally argues legislative history shows that the Legislature intended students to be protected by the two-thirds vote requirement and fee cap of section 89304 in all student union financing using flat fees and that the intent to protect the student from increasing flat fees is defeated by adopting CSU and AS's position. Rizzo specifically refers to the Enrolled Bill Report on Senate Bill No. 350 which in 1985 amended section 89304 to increase the fee cap from $20 to $40. The report recommends signature of the bill because, inter alia, while the bill would increase student fees, students would be protected by the statutory requirement that an increase be approved by a two-thirds vote of the students. (Cal. Dept. of Finance, Enrolled Bill Rep. for Sen. Bill No. 350 (1985-1986 Reg. Sess.).) Rizzo takes the position that the report demonstrates the Legislature believed the students were protected by the fee cap and voting requirements of section 89304 when in reality CSU had been disregarding the limitations once bonds had been issued.

The legislative history is ambiguous. For example, with respect to Senate Bill No. 350, the 1985 amendment raising the fee cap, it is far from clear whether legislators believed the cap would apply to all students. While there are repeated references to the students being protected by the two-thirds vote requirement (see, e.g., Sen. Com. on Education, Staff Analysis of Sen. Bill No. 350 (1985-1986 Reg. Sess.); Sen. Rules Com., Analysis of Sen. Bill No. 350 (1985-1986 Reg. Sess.); Assem. Subcom. on Higher Education, Analysis of Sen. Bill No. 350 (1985-1986 Reg. Sess.)), there are also repeated references that the legislation would directly impact only those campuses where student unions had not yet been constructed (see, e.g., Sen. Rules Com., Analysis of Sen. Bill No. 350, *supra*; Cal. Dept. of Finance, Analysis of Sen. Bill No. 350 (1985-1986 Reg. Sess.).) As previously discussed, letters and a fact sheet found in the legislative history file specifically advise legislators that CSU has been imposing fees in excess of the section 89304 fee cap once bonds have been issued under the 1947 Bond Act and that CSU does not consider section 89304 to apply once bonds are issued and outstanding. While it is not clear how widely the letters were circulated, it is clear at least some legislators, including a sponsor of the bill, were aware of CSU's interpretation and failed to take any action to amend the sections to prevent its continued application.

In summary, CSU for almost 30 years has consistently interpreted and harmonized sections 89303 and 89304 and the 1947 Bond Act to impose fees

under section 90068 or its predecessor and not section 89304 or its predecessor once bonds have issued. As previously discussed, we find that interpretation to be reasonable and consistent with the statutory language. CSU has entered into multiple transactions consistent with that interpretation including the issuance of revenue bonds for many millions of dollars. There is some direct evidence within the relevant legislative history of the statutes that at least some legislators were aware of and accepted CSU's interpretation of the statutes as correct. Moreover, the legislators are presumed to be aware of the long-standing administrative practice and have amended at least section 89304 without making changes addressed to the administrative practice. The acts of the Legislature indicate the administrative practice is consistent with the legislative intent. (*DeYoung* v. *City of San Diego*, *supra*, 147 Cal.App.3d at pp. 18-19.)

 We therefore interpret and harmonize sections 89303, 89304 and the 1947 Bond Act as follows: (1) the Trustees may use the authority of sections 89303 and 89304 to fix and collect student fees from all students attending a state university for the construction of a student union or activity center at that state university, provided the fees do not exceed the statutory fee cap of section 89304 and the amount of fees up to that statutory limit have been approved by two-thirds of the students voting in an election for that purpose; (2) once revenue bonds have been issued under the 1947 Bond Act and those bonds remain outstanding, the Trustees, consistent with their obligations to the bondholders expressed in that act, may under sections 90012, subdivision (c), and 90068 impose student fees without regard to the fee limitation of section 89304; and (3) the fees imposed under sections 90012, subdivision (c), and 90068 with respect to student unions and student activity facilities may be imposed on all students attending the campus without regard to their actual use of the facilities.

II

*Imposition of Fees Dedicated to the SAC Before the Issuance of Series B Bonds*

 Having determined that once bonds have issued and are outstanding, the Trustees under sections 90012, subdivision (c), and 90068 may impose flat student union fees on all students attending a university consistent with the Trustees' obligation to the bondholders, we are left with the question whether the Trustees had the authority to impose student union fees dedicated to the SAC before Series B bonds for the construction of the facility had issued.

Rizzo contends that the 1947 Bond Act under sections 90012, subdivisions (c) and (d), and 90068 authorizes the charging of fees to meet existing

obligations to bondholders for projects already acquired, constructed or completed only. Rizzo particularly relies on wording within section 90012, subdivision (d), that the Trustees may enter into covenants to increase rates and charges "from time to time as may be necessary pursuant to any contract or agreement with the holders of any bonds" and wording within section 90068 to fix rents, charges and fees for projects "acquired, constructed or completed" and to fix rents, charges and fees to yield annual revenues to meet operating and maintenance expenses including "all redemption payments and interest charges and reserve fund requirements on revenue bonds at any time issued and outstanding hereunder, as the same become due."[11]

Rizzo further contends obligations existing as to the Series A bonds cannot be used to support charging fees CSU admits are being collected in advance to service the Series B bonds if and when they are sold to construct the SAC. Rather, Rizzo argues the Series A bonds and Series B bonds are separate and distinct and there is no existing legal obligation for the Series B bonds. Moreover, Rizzo notes the SAC fees were collected for three years before the Series B bonds were even authorized by the supplemental resolution and argues such "authorization" does not in any event create a legal obligation necessary to support imposing flat fees on the students.

---

[11]Rizzo contends her position is consistent with the 1966 and 1975 opinions by Epstein and Chapman. In addition to the sections of Epstein's opinion set forth on page 863, *ante*, Rizzo specifically relies on statements in the Epstein opinion that:

"Education Code Sections 23804 and 23805 [predecessor sections to current sections 89303 and 89304 respectively] appear to be the only provisions in the Code authorizing the exaction of a fee for the purpose of accumulating funds to construct a student body facility, as distinguished from a fee to be used for the operation of the facility or its debt service, or both. . . .

". . . . . . . . . . . . . . . . . . . . . . . .

"There is, in addition, a particular statutory authority with respect to fees on revenue bond projects. It is our advice that this authority be utilized with respect to bond projects actually constructed and in operation. . . ."

With respect to the Chapman memorandum, Rizzo directs our attention to the following statements regarding the provisions of section 23805 (predecessor section to section 89304):

"That section indicates that upon a favorable vote of two-thirds of the students in an election, concerning the establishment of a student union, the Trustees would be authorized to fix a building and operating fee not to exceed '$20.00 per student per academic year.' It should be noted under this provision which is applicable prior to the actual sale of bonds for the union and the construction thereof, the fees collected are available for financing, constructing and operating a student union center . . . .

". . . . . . . . . . . . . . . . . . . . . . . .

"After revenue bonds are issued, and sold pursuant to the State College Revenue Bond Act of 1947, union fees are no longer collected pursuant to Education Code Section 23805, but instead are *collected and authorized* pursuant to Education Code Section 24556 [predecessor section to section 90068]."

CSU, on the other hand, contends that because of the unitary nature of student union facilities and the Trustees' statutory and contractual commitments and obligations to existing bondholders, it may collect fees dedicated to future projects before bonds to finance the project issue. That is, the Trustees' broad powers under the 1947 Bond Act with respect to protecting existing and future bondholders and the provisions of the 1968 Resolution allow the Trustees to charge student union fees necessary to achieve the financial stability to proceed with the SAC on a timely basis without impairing the marketability of the Series B bonds or the security of the original Series A bondholders. As discussed below, we agree.

The 1947 Bond Act defines project to mean both existing facilities and those authorized for future completion or a combination of the two. (§ 90011, subd. (c).) The Trustees are authorized to issue bonds in series to finance future facilities for a student union. Section 90012, subdivision (c), permits the Trustees, subject to contractual obligations, to "alter, change or modify" fees "at [their] pleasure" while section 90068 authorizes them to change fees "from time to time, as conditions warrant." Moreover, the Trustees are authorized to enter into indentures and are given broad authority to provide for adequate security and protection for bondholders.[12]

The 1968 Resolution defines the term "project" by describing Aztec Center. "Union" is defined to mean the project and all additions and improvements including additional projects for which additional series of bonds are issued. The 1968 Resolution specifically authorizes the sale of Series A bonds in the amount of $2,940,000 for the construction of Aztec

---

[12]See section 90011, subdivision (f) (revenues defined to include any revenue that may have been deposited in funds created "for the security of any notes or bonds issued hereunder, or for the purpose of providing for the payment thereof, or the interest thereon"); section 90012, subdivision (d) (Trustees empowered to increase charges as may be necessary pursuant to any contract with the holders of bonds); section 90012, subdivision (e) (Trustees empowered to issue secured revenue bonds to, inter alia, raise funds to establish projects, acquire lands for projects, constructing, improving, furnishing, financing, refinancing projects); section 90018 (Trustees empowered to enter into indentures, defined in section 90011, subdivision (h), as agreements pursuant to which revenue bonds are issued); section 90019 (indenture may include covenants and agreements by the Trustees as deemed necessary to better secure the bonds issued thereunder); section 90020 (indenture may provide payment of bond principal and interest shall be secured by revenues); section 90024 (indenture may include clause requiring Trustees to preserve and protect security of the bonds issued thereunder and to preserve, protect and defend the rights of the holders); section 90027 (indenture may include clause requiring Trustees to fix and collect charges related to the project sufficient to pay the principal and interest of the bonds as they become due and payable, with "additional sums as may be required for any fund created by this article, for the further security of such bonds . . . or other charge in connection with such project"); section 90028 (indenture may include clause requiring Trustees to hold revenues in trust and to apply revenues only as provided in the indenture); section 90035 (indenture may include clause providing for acts necessary to better secure the bonds or make them more marketable).

Center and provides that the Trustees by supplemental resolution can establish one or more other series of bonds to provide for additional projects. Under the 1968 Resolution, additional series of bonds are equally and ratably secured with all other authorized bonds without preference or priority with the principal and interest for all bonds payable from and secured by the net revenues from the "Union."

Moreover, the 1968 Resolution provides that so long as any bonds are outstanding, the Trustees shall levy student union fees against each SDSU student in an amount sufficient (together with other net revenues) to pay debt service on the bonds as it becomes due, to pay funds to certain bond and reserve accounts and to maintain and operate the "Union." As conditions precedent to the issuance of additional bond series, net revenues during the preceding fiscal year and estimated annual net revenues to be derived from the "Union" including the additional project are required to be equal to at least 1.25 times the combined average annual debt service on the bonds. Further, in estimating the net revenues, future student union fees are to be calculated based on actual student union fees for the preceding fiscal year adjusted to reflect changes in the fee schedule for the succeeding fiscal year and anticipated changes in operation and maintenance expenses.

As early as 1978, bond counsel concluded the fees that could be collected under section 90068 were limited only by the obligations to bondholders and the requirements of the section that fees be fixed to yield sufficient revenues to service bonds issued.

It is clear from the 1947 Bond Act and the 1968 Resolution that where more than one bond series issue, the Trustees' commitments and obligations to bondholders, regardless of series, are co-extensive and are based on the viability of the student union as whole and not on the individual projects. The financial stability of the total student union including Aztec Center and the future SAC affect the security of existing bondholders as well as future bondholders for the Series B bonds. For the Trustees to issue the Series B bonds without sufficient reserves to protect the security of the Series A bondholders of which $1,475,000 still remained outstanding as of February 1993 would violate the broad obligations and commitments imposed by the 1947 Bond Act and the 1968 Resolution. Accordingly, we conclude CSU's existing obligations and commitments to the existing bondholders provided the authority to impose fees dedicated to the SAC before the issuance of the Series B bonds.[13]

---

[13]The students are not without protection where bonds remain outstanding. CSU has adopted a procedure providing for an advisory majority student vote before fees can be

## DISPOSITION

Judgment affirmed.[14]

Todd, J., and Froehlich, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 20, 1994. Kennard, J., was of the opinion that the petition should be granted.

---

materially increased to expand existing facilities. Here, 65 percent of the SDSU students voting, voted in favor of the SAC and the fee schedule eventually imposed.

[14]Because we conclude CSU had authority to impose the fees before issuance of the Series B bonds, we do not reach CSU and AS's additional argument that even if CSU acted improperly, its acts have been validated and rendered incontestable by Rizzo's failure to file the complaint within the statute of limitations provided in the Second Validating Act of 1991. (Stats. 1991, ch. 398, § 1, p. 1845.)