[No. C020539. Third Dist. Apr. 22, 1997.]

WILLIAM R. HEWLETT et al., Plaintiffs and Appellants, v.
SQUAW VALLEY SKI CORPORATION, Defendant and Appellant.

508

COUNSEL

Bradford R. Fenocchio, District Attorney, Joseph F. Barbara, Deputy District Attorney, Remy, Thomas & Moose, Michael H. Remy, McCutchen, Doyle, Brown & Enersen, Terry J. Houlihan, Stephanie S. Lamarre, John V. Wadsworth and Michael T. Pyle for Plaintiffs and Appellants.

Brobeck, Phleger & Harrison, Jeffrey S. Kingston, Thomas M. Peterson and Michael B. Green for Defendant and Appellant.

OPINION

**SPARKS, Acting P. J.**—In this appeal we are presented with the latest installment in the continuing dispute between defendant Squaw Valley Ski Corporation (Squaw Valley) and objecting parties over the development of ski runs in an area of Squaw Valley's ski resort known as the "Tram Basin Bowl." When litigation threatened the planned project, Squaw Valley in essence resorted to self-help and cut more than 1,800 trees.

The Placer County District Attorney brought a lawsuit for unfair competition asserting Squaw Valley had engaged in unlawful business practices in cutting down these trees. (Bus. & Prof. Code, § 17200.) A second suit, brought by a private individual, William R. Hewlett, and the Sierra Club, made similar allegations. The district attorney dismissed his suit and joined Hewlett and the Sierra Club as a plaintiff in their lawsuit.

The trial court found defendant Squaw Valley had engaged in unfair competition by committing unlawful business practices by violating provisions of the Z'berg-Nejedly Forest Practice Act (Forest Practice Act or FPA)

(Pub. Resources Code, § 4511 et seq.), violating provisions of a conditional use permit and violating terms of a temporary restraining order. The court imposed fines totaling $223,000, ordered mandatory and prohibitory injunctive relief, and awarded attorney fees to plaintiffs Hewlett and Sierra Club.

On appeal, Squaw Valley contends it did not engage in ongoing unlawful business practices, and did not violate the Forest Practice Act or the temporary restraining order. It further asserts that violations of a use permit or a temporary restraining order cannot form the basis for a claim of unlawful business practices under the unfair competition statute. Squaw Valley also challenges the remedies imposed and the award of attorney fees.

In a protective cross-appeal, plaintiffs contend the court erred in refusing to permit an amendment to their complaint and in granting Squaw Valley's motion for directed verdict on certain portions of the complaint.

We shall affirm the judgment and dismiss the cross-appeal as moot.

### Factual and Procedural Background

The genesis for this case was described in a previous unpublished decision of this court, *Sierra Club* v. *County of Placer* (Apr. 13, 1994) C012901, in which we held that the environmental impact report (EIR) prepared for the ski run expansion was inadequate. We quote from that opinion:

"Squaw Valley, one of several ski areas in the vicinity of Lake Tahoe, is located near the Tahoe National Forest and the Granite Chief Wilderness Area. The resort hosted the 1960 Winter Olympic games and has grown significantly since that time. We briefly recount the pertinent history related to this development.

"In 1972, County adopted the 'Squaw Valley General Plan,' which focused in part on the Shirley Canyon area and a number of proposed ski lifts. Noting the area had 'sensitive geologic, soil, slope and vegetative characteristics,' the plan recommended that 'Shirley Lake Canyon skiing be devoted to cross-country type skiing thus alleviating the need for extensive tree cutting and trail grooming. The Shirley Lake Canyon area is extremely sensitive to development and should remain in its natural state as the gateway to the Granite Chief area.' The plan eliminated proposed 'Shirley Lake #2' ski lift finding such a lift 'might cause irreparable environmental damage because of ski run clearing and trail grooming needed to establish this lift as a recreation ski lift. . . .'

"In 1975, County released the 'Squaw Valley Master Ski Lift' final EIR, which related to Squaw Valley's plans to build four new ski lifts. . . .

Ultimately, a conditional use permit (CUP-067) was issued for the construction of the Silverado/Squaw Creek lift, located in the Shirley Canyon area. Squaw Valley had represented that approximately 90 trees would need to be removed to build the lift and clear the ski trails. Apparently, this was intended as a 'through-the-trees' expert ski run. The permit specified the lift 'and accompanying trails or runs shall be planned and designed in such a way that there will be no need to construct trails, runs, tree removal, maintenance roads, access roads, etc. in the lower Shirley Canyon area now or in the future.'

"Some time later, Squaw Valley applied for a conditional use permit and general plan amendment to build another lift, the Solitude lift. The permit issued (CUP-095) but due to 'flagrant[] and willful[]' violations of conditions imposed to protect the environment, the permit was revoked in September 1976. The parties ultimately settled their differences and Squaw Valley prepared another EIR for the Solitude lift project in 1978.

"Litigation continued on another front, however, when CUP-067 expired before the Silverado/Squaw Creek lift was built. County agreed to extend this permit after the proposed location of the lift terminal was moved so that it would not intrude into the stream environment zone . . . of Squaw Creek.

"In 1982, Squaw Valley sought to amend this permit to allow several lifts, including the Silverado/Squaw Creek lift, to expand their capacity by installing triple chair lifts instead of the double lifts previously approved. An EIR was prepared and the change was ultimately approved.

"In 1983, the Squaw Valley General Plan was updated. The plan, and the EIR prepared in conjunction with that plan, described some of the area's environmental problems, including traffic congestion, the degradation of water quality in Squaw Creek and the Truckee River, and air pollution on heavier traffic days. To protect Shirley Canyon and preserve its 'existing natural, semi-primitive state,' the plan zoned the area as 'conservation preserve.'[1] The plan encouraged transferring the permit rights for the Silverado/Squaw Creek lift to another lift area. The plan further noted: '[I]t is recognized that a current Conditional Use permit (CUP-067) exists which authorizes the construction of a new ski lift in Shirley Canyon, known as the Squaw Creek lift. This lift is shown in the Squaw Valley General Plan although it is not consistent with the current goals of the Plan as they relate to Shirley Canyon. Certain conditions placed on the Conditional Use Permit of this lift will serve to mitigate some of the adverse impacts resulting from

---

[1]Under "Conservation Preserve" zoning, lifts may not be constructed and trails may not be cleared, thus precluding downhill skiing. "Forest Recreation" zoning permits alpine skiing.

its construction and operation. Placer County has an obligation to permit the construction of the Squaw Creek lift if the permit is exercised within the time period allowed and if the conditions of approval are met. Should the permit not be exercised and its approval lapse, the lift should not be approved again.'

"Squaw Valley filed an action for inverse condemnation, asserting this rezoning unconstitutionally deprived it of the use of its property without just compensation.[] Nonetheless, in 1984, construction on the lift began. In mid-1986, in an apparent attempt to settle the 'takings' litigation, Squaw Valley applied for a general plan amendment and zoning change, seeking to have additional land surrounding the Squaw Creek lift zoned 'forest recreation' rather than 'conservation preserve.' Squaw Valley also sought a conditional use permit to cut down 1,858 trees to enlarge the trails served by the Silverado/Squaw Creek lift. County ordered the preparation of a full EIR for this project."

On July 25, 1988, the Placer County Board of Supervisors approved the EIR, the general plan amendment, the zoning change, and the conditional use permit (CUP-974), and in October 1988, the zoning change ordinance was approved. Squaw Valley was thus authorized to cut the trees necessary to develop the ski runs to be served by the Silverado lift.

Glen Smith, a professional forester who worked for Squaw Valley, spoke with an official from the California Department of Forestry (CDF), who suggested that Squaw Valley might want to sell the felled trees, instead of simply leaving them for employees to use as firewood. Squaw Valley decided selling the timber should remain an option and therefore amended the timber management plan it had previously submitted to delete language stating the timber would be used "for ski area construction or for fuelwood."

In October 1988, Squaw Valley applied for a timberland conversion permit from CDF. This permit is required of "[a]ny person who owns timberlands which are to be devoted to uses other than the growing of timber . . . ." (Pub. Resources Code, § 4621.) In an affidavit filed with this application, James Mott, the president and general manager of Squaw Valley, declared under penalty of perjury that conversion of the land "will commence about April 15, 1989."

In October 1988, the Sierra Club filed suit to set aside the EIR and the project approvals. The trial court issued an alternative writ of mandate, directing Squaw Valley to show cause why the project approvals should not be set aside. The hearing was initially scheduled for January 31, 1989.

Because Squaw Valley had indicated that it did not plan to cut any trees until April 1989, the court did not issue a temporary restraining order. The hearing date on the alternative writ and request for preliminary injunction was extended to March 10 by stipulation of counsel, and subsequently extended again to April 1989.

In the meantime, in December 1988, CDF acted on Squaw Valley's application and issued a timberland conversion permit.

Smith prepared a timber harvesting plan, a plan required for all timber operations. (Pub. Resources Code, § 4581.) This type of plan serves the same function as an EIR, and requires a period of public comment. (Cal. Code Regs., tit. 14, § 896, subd. (a).) The plan reiterated that timber operations would begin in April 1989. Mott signed this plan for Squaw Valley on January 24, 1989, certifying that it conformed to Squaw Valley's plans and that harvesting would be conducted in accordance with it. The plan was submitted to CDF the next day.

Despite the representations made in the timber harvesting plan and the application for the timberland conversion permit, Squaw Valley in fact had other plans for the trees. Concerned about the litigation threatening the development of the ski trails, particularly a possible injunction, Mott decided in mid-January to cut the trees ahead of schedule. Mott put an unlicensed timber operator on "standby" to fell the trees, and made similar arrangements with a helicopter company to remove the cut trees.

Mott met with Alexander Cushing, the owner of Squaw Valley, at Cushing's home. Another Squaw Valley employee, the director of security, was making a delivery at the house and overheard Cushing say to Mott: "We have a very short time frame here. We have the legal documents to proceed on this. Let's get these things cut. What are they going to do, make us replant them?"

Mott and Cushing decided to cut the trees over the upcoming weekend, January 28-30, 1989. A few days before the cut, Mott informed Smith of this plan, and Smith urged that the cut be delayed until the timber harvesting plan was approved, an action that could have occurred within a short period of time. Smith pointed out possible legal ramifications if the cut proceeded. Despite "numerous and very pointed" discussions with Smith on this subject, Mott determined that the cut should proceed as planned, although he wanted to continue to seek approval of the timber harvesting plan to allow sale of the felled timber.

On January 28-30 1989, Squaw Valley cut more than 1,800 trees, some of which were 300 to 600 years old. Approximately 1,320 of the felled trees

were over 6 inches in diameter at breast height (DBH); 555 trees were smaller. The area was essentially clear cut. Contrary to the terms of CUP-974, no registered forester was present during the initial phase of cutting.

When Smith arrived on the scene about noon on January 28, he discovered that Squaw Valley was using sites other than those approved in CUP-974 to deposit the cut logs. When he pointed this out, Mott ignored him and continued to use the unapproved locations. One of these spots did not have access for log removal, necessitating the construction of a spur road to provide access.

Smith was concerned that the cut had proceeded without an approved timber harvesting plan, and prepared a letter on January 30 for Mott's signature to request withdrawal of the plan. On February 3, Smith learned Mott had not mailed this letter, nor had he mailed another letter requesting cancellation of the plan. Mott had not signed these letters because he was still hoping to sell the timber that had been cut, an intention he reiterated to Smith in a telephone conversation on February 3. Smith learned Squaw Valley had an offer of $30,000 from the helicopter company for the lumber.

On February 7, 1989, Smith wrote to CDF to withdraw his signature from the timber harvesting plan application. Not until February 8, after receiving a call from CDF, did Mott withdraw the plan, request cancellation of it, and abandon his hope of selling the timber.

Immediately after the January cut, the Sierra Club obtained a temporary restraining order (TRO) prohibiting any further cutting of trees. In March 1989, while this TRO was in effect, Mott ordered a crew to cut 18 trees in the Tram Basin Bowl. The trees that were cut were outside the boundary described in CUP-974. Some were more than six inches DBH; the others were smaller. There was no registered professional forester present during this cut.

A complaint was filed by plaintiffs Hewlett and Sierra Club charging Squaw Valley with unfair competition. (Bus. & Prof. Code, § 17200.) As amended after the Placer County District Attorney joined as a party plaintiff, the complaint, now brought in the name of the People as well as of Hewlett and the Sierra Club, alleged unfair competition in that Squaw Valley had violated the Forest Practice Act by attempting to withdraw its timberland conversion permit and timber harvesting plan after cutting timber in the Shirley Canyon area, cutting before the date specified in the plan, cutting without an approved plan, and failing to notify CDF before commencing timber operations.

The amended complaint also alleged that the failure to comply with numerous conditions in CUP-974 violated Public Resources Code section 4622[2] and constituted unlawful business practices. Specifically, the complaint alleged Squaw Valley violated: condition 5, by removing trees cut in January 1989 to unapproved landing areas; condition 6, by failing to have a registered professional forester in attendance during the initial stages of the January cut or at any time during the March cut; condition 10, by failing to submit written evidence of permit approval from CDF; condition 12, by failing to properly field stake the boundaries of the January and March cuts and by cutting outside the approved boundaries; condition 15, by failing to submit a management program detailing the construction, revegetation and schedules for new ski trails; condition 18A, by failing to submit sufficient security to guarantee reforestation; and condition 24, by failing to properly field stake the boundaries of the new ski runs or flag trees to be cut prior to the issuance of permits.

The complaint also alleged Squaw Valley had committed an unlawful business practice by cutting trees in violation of the TRO.

The complaint sought monetary penalties as well as injunctive relief.

In October 1993, during the course of the trial, the court and the parties visited the scene and discovered that additional trees had been cut in the area within the preceding year. Some were over six inches DBH and others were smaller. Trees had been cut nearly flush with the ground, and several logs had rolled into the watercourse.

While all of this activity was happening, the related litigation concerning the validity of the EIR continued. The trial court determined that the EIR was inadequate. This court affirmed that decision in April 1994, finding the EIR improperly incorporated other documents by reference, failed to address cumulative impacts of various Squaw Valley projects, and did not properly analyze certain project alternatives. (*Sierra Club* v. *County of Placer, supra,* C012901.)

At trial, Squaw Valley insisted that no timber harvesting plan was needed because it did not sell the cut lumber and therefore did not engage in "timber operations." It asserted that violations of a conditional use permit did not

---

[2]Public Resources Code section 4622, part of the FPA, provides: "Approval of an application for conversion shall be conditioned upon the granting of the necessary rezoning or use permit if rezoning or a use permit is required." The statute also requires that timber be cut "pursuant to an approved conversion" and that "no timber operations shall commence until the granting of such rezoning or use permit as may be required and until the timberland conversion permit is recorded."

constitute unlawful practices, and disputed that it had violated any conditions of CUP-974. Although it admitted knowledge of the TRO, Squaw Valley argued this order had expired and was not in effect at the time of the March 1989 cut.[3]

In October 1994, the trial court issued its statement of decision. The court concluded Squaw Valley had violated the Forest Practice Act by conducting timber operations in 1989 and 1992 without an approved timber harvesting plan. The court also found Squaw Valley had violated CUP-974 conditions 5 (use of unapproved landing areas), 6 (no registered professional forester in attendance), 10 (failure to submit permit to planning department), 12 (cutting outside the boundaries in March 1989), and 18A (insufficient security).[4] The court further concluded that Squaw Valley had violated the TRO when it cut trees in March 1989.

The court ruled these cumulative acts, committed in January 1989, March 1989 and in 1992, constituted an ongoing business practice within the meaning of Business and Professions Code section 17200.

In determining the proper remedies for Squaw Valley's unfair competition, the court noted that had Squaw Valley simply waited to cut these trees, it might have done so lawfully. "Most, if not all of the conditions in the use permit had been satisfied, and those that were not could have been easily satisfied. Were it not for the pending litigation and the possibility that a preliminary injunction might have issued, all that [Squaw Valley] would have needed to do was to wait until April, secure their [timber harvesting plan], and harvest the trees. [¶] [Squaw Valley] chose, however, to take two gigantic gambles: (1) that [it was] correct in that the trees could be legally harvested; and (2) that the pending lawsuit in the [related litigation concerning the EIR] would be resolved in [its] favor. [Squaw Valley] was wrong in both regards."

The court noted that the pending EIR litigation put Squaw Valley on notice that the project approvals might be set aside. Because the EIR had, in fact, been found inadequate, Squaw Valley "can no longer argue that they would have, in any event, been entitled to cut the trees at some future time. The risk of an incorrect decision to cut the trees lies with [Squaw Valley]. Consequently, they must bear the burden of gambling with environmental resources, and losing. It is a fact that the trees are cut, and no order from this court will change that unfortunate loss."

---

[3]During trial, the court issued a preliminary injunction prohibiting Squaw Valley from cutting any trees in the disputed area and otherwise taking actions to implement the Silverado project.

[4]The court found there was insufficient evidence to support the other allegations relating to violations of CUP-974.

Noting that Alexander Cushing had testified that he would like to develop additional ski trails in this area, the court commented that it was important that Squaw Valley "not jeopardize environmental resources still within [its] control. It is apparent that the protection of the planning laws and the authority of the planning authorities have been insufficient to prevent [Squaw Valley] from taking the actions it has in this case."

The court imposed monetary penalties totaling $223,000 and ordered mandatory and prohibitory injunctive relief. Specifically, the court ordered Squaw Valley to (1) remove sawed logs from the watercourse and deposit areas; (2) continue with reforestation and revegetation as had been required under CUP-974; and (3) deposit an appropriate letter of credit to guarantee the reforestation efforts. The court also ordered that if Placer County refused to rezone the land for downhill skiing and refused to issue a use permit for that purpose, Squaw Valley was to comply with FPA provisions requiring the restocking, revegetation and reforestation of the area that had been unlawfully cut.

As to the prohibitory injunctive relief, the court ordered that "the area covered by the preliminary injunction issued herein shall constitute a zone free from further development in any manner. This injunction requires [Squaw Valley] to allow the area to which it relates to remain in its natural state. The court specifically excepts from this injunction that portion of the area which is covered by Phase I of CUP 974. That area, including the Silverado lift itself, and the adjoining ski runs, shall not be affected by the prohibition against development. However, no activities relating to operation of the ski lift, nor maintenance of the ski runs shall be conducted unless specific authorization, along with the appropriate permits to be issued, are granted by the appropriate Placer County authorities. In other words, Phase I of the project contemplated by CUP 974 shall remain unaffected by this injunction."

The court also enjoined "any tree cutting ('tree,' as defined herein means any tree growth whatsoever, including seedlings) in any area covered by this injunction. Permission to cut any tree, including 'hazard' trees shall lie with the Placer County Planning Department if [Squaw Valley] desires to re-mov[e] any tree within Phase I of the project area. [Squaw Valley] shall not remove any tree outside the area covered by Phase I without specific permission granted by this court. If, [f]or some reason not related to devel-opment, [Squaw Valley] wishes to remove a tree or trees in such area, application shall be made to this court for permission to do so. . . . The

court shall have the power to allow such cutting on an ad hoc basis, as may be equitable (e.g. public safety)."[5] (Fn. omitted.)

The court awarded attorney fees of $480,000 to Hewlett and $192,000 to the Sierra Club.

Judgment was entered in accordance with the statement of decision, and this appeal followed.[6]

## DISCUSSION

### I. *Squaw Valley's Acts Constitute Ongoing Business Practices*

■ Squaw Valley contends the court erroneously equated a business practice with multiple violations of law predicated on a single project, the development of one ski run. This characterization is misconceived.

At the time relevant to this case, the unfair competition statute provided: "[U]nfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 [relating to advertising] (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." (Bus. & Prof. Code, § 17200; Stats. 1977, ch. 299, § 1, p. 1202 [all

---

[5]The trial court specifically stated: "In arriving at what the court p[er]ceives as suitable remedies in this matter, the court has given consideration to a balancing of the remedies in order to achieve a proper relationship between [Squaw Valley's] conduct herein, the damage done, the potential for remediation of damage, and the existence of the potential for future damage to the environment. If it is subsequently determined that the court has exceeded [its] powers, or that the remedies set forth herein are unauthorized or inappropriate, the court would fashion different remedies or change the scope of those actually imposed in order to conform to that which may subsequently be deemed permissible. In particular, [if it] is subsequently determined on appeal that the injunctive relief granted herein is unwarranted or unavailable, this court would have imposed substantially higher monetary sanctions. Conversely, should the monetary sanctions prove to be impermissible in the amounts imposed, then a greater scope of injunctive relief would have been considered. The court has also determined the scope of the remedies awarded in reaching an appropriate award of attorneys fees." (Fn. omitted.)

[6]We grant Squaw Valley's motion to take judicial notice of the fact that on April 30, 1996, the Placer County Board of Supervisors once again rezoned the area described in CUP-974 as forest recreation land. We grant plaintiffs' motion to take judicial notice of exhibits A (this court's decision in *Sierra Club* v. *County of Placer, supra,* C012901), B (denial of petition for review in No. C012901), C (report of the Senate Rules Committee on Assembly Bill No. 4098), and H (stipulation regarding dismissal in People v. Squaw Valley Ski Corp. (Super. Ct. Placer County, 1993, No. SCV00748)). We deny plaintiffs' request for judicial notice of exhibits D, E, F, and G, relating to complaints and settlement agreements in other litigation involving Squaw Valley.

subsequent statutory references in this part are to the Business and Professions Code unless otherwise indicated].)[7] The remedies and penalties authorized for violation of this statute are cumulative to each other and to any other penalties or remedies available elsewhere in the law. (§ 17205.)

█ The unfair competition statute is not confined to anticompetitive business practices, but is also directed toward the public's right to protection from fraud, deceit, and unlawful conduct. (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209-210 [197 Cal.Rptr. 783, 673 P.2d 660].) Thus, California courts have consistently interpreted the language of section 17200 broadly. (*People* v. *McKale* (1979) 25 Cal.3d 626, 631-632 [159 Cal.Rptr. 811, 602 P.2d 731].) "An 'unlawful business activity' includes ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' " (*Id.* at p. 632, quoting *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d. 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817]; accord, *Samura* v. *Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1291-1292 [22 Cal.Rptr.2d 20].) "The Legislature apparently intended to permit courts to enjoin ongoing wrongful business conduct in whatever context such activity might occur." (*Committee on Children's Television, Inc.* v. *General Foods Corp., supra*, 35 Cal.3d at p. 210; accord, *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730]; *Consumers Union of United States, Inc.* v. *Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433, 1438-1439 [257 Cal.Rptr. 151].)

The use of the phrase "business practice" in section 17200 indicates that the statute is directed at ongoing wrongful conduct. (*State of California ex rel. Van de Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147, 1169 [252 Cal.Rptr. 221, 762 P.2d 385].) As the California Supreme Court explained: "[T]he 'practice' requirement envisions something more than a single transaction . . . ; it contemplates a 'pattern of conduct' [citation], 'on-going . . . conduct' [citation], 'a pattern of behavior' [citation], or 'a course of conduct.' . . ." (*Id.* at pp. 1169-1170.)

Squaw Valley's primary business activity was the operation of a ski resort. The creation and development of ski runs and ski trails were clearly part of that activity or practice. On January 28-30, 1989, Squaw Valley cut down more than 1,800 trees to create a ski run for the Silverado lift. In March 1989, an additional 18 trees were felled. In 1992, more trees were cut in this area.

---

[7]In 1992, the Legislature amended this section to provide that "unfair competition shall mean and include any unlawful, unfair or fraudulent business *act or* practice . . . ." (Stats. 1992, ch. 430, § 2, italics added.)

■ Contrary to its characterization, Squaw Valley's actions did not involve one event or a single episode. A large number of trees were cut over three different time periods. The fact that these acts were charged as violations of the Forest Practice Act, CUP-974, and the TRO is immaterial. These multiple violations related to a course of conduct, not one isolated incident. These actions can properly be termed business practices for purposes of section 17200. (See *Allied Grape Growers* v. *Bronco Wine Co.* (1988) 203 Cal.App.3d 432, 452-453 [249 Cal.Rptr. 872]; *People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 515, 526-527 [206 Cal.Rptr. 164].)

In a related argument, Squaw Valley asserts it cannot be guilty of violating section 17200 because it lacked the intent to engage in an unlawful business practice. However, such an intent is not an element of such a violation. (*People* ex rel. *Van de Kamp* v. *Cappuccio, Inc.* (1988) 204 Cal.App.3d 750, 760-761 [251 Cal.Rptr. 657].) "The statute imposes strict liability. It is not necessary to show that the defendant intended to injure anyone." (*State Farm Fire & Casualty Co.* v. *Superior Court* (1996) 45 Cal.App.4th 1093, 1102 [53 Cal.Rptr.2d 229].) Here, Squaw Valley intended to cut down the trees and did so. The fact that it may have believed its conduct was lawful under the Forest Practice Act, CUP-974 and/or the TRO is not a defense.

Before turning to the question of whether Squaw Valley's actions were unlawful, we pause to comment on one recurring theme. Squaw Valley repeatedly urges that any violation of the FPA, CUP-974 or TRO should be addressed in a different forum, and not be prosecuted as an unlawful business practice. Consequently, so the argument goes, violations of the FPA should be handled by CDF, violations of CUP-974 should be dealt with by Placer County, and violations of the TRO should be left to the issuing court to punish through contempt proceedings.

This argument runs afoul of section 17205, which specifically provides that ". . . the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state." Thus, the fact that other entities might have addressed these violations has no bearing on whether Squaw Valley's conduct also constitutes an unlawful business practice under section 17200.

II. *Violations of the Forest Practice Act*

The trial court concluded that because Squaw Valley intended to sell the cut timber, a "timber operation" had taken place, necessitating a timber

harvesting plan and a timberland conversion permit. The court found Squaw Valley's failure to obtain an approved timber harvesting plan violated the FPA (Pub. Resources Code, § 4511 et seq. [all subsequent statutory references in this part are to the Public Resources Code unless otherwise indicated]) and thus was an unlawful business practice.

On appeal, Squaw Valley contends that because the timber was not ultimately sold, no timber operation occurred and the permit requirements were inapplicable. Squaw Valley raises other related claims, asserting (1) the court should have deferred to CDF's interpretation of the FPA, (2) the court erred in denying its motion to defer the matter to CDF under the doctrine of primary jurisdiction, (3) due process concerns were implicated, and (4) principles of estoppel preclude the imposition of liability. None of these contentions has merit.

To put Squaw Valley's claims in their proper perspective, we briefly outline relevant provisions of the FPA and related regulations. In enacting the FPA, the Legislature found "that the forest resources and timberlands of the state are among the most valuable of the natural resources of the state and that there is great concern throughout the state relating to their utilization, restoration, and protection." (§ 4512, subd. (a).)[8] The Legislature further found "that the forest resources and timberlands of the state furnish high-quality timber, recreational opportunities, and aesthetic enjoyment while providing watershed protection and maintaining fisheries and wildlife." (§ 4512, subd. (b).) Therefore, the Legislature declared "that it is the policy of this state to encourage prudent and responsible forest resource management calculated to serve the public's need for timber and other forest products, while giving consideration to the public's need for watershed protection, fisheries and wildlife, and recreational opportunities alike in this and future generations." (§ 4512, subd. (c).)

Section 4513 provides: "It is the intent of the Legislature to create and maintain an effective and comprehensive system of regulation and use of all timberlands so as to assure that: [¶] (a) Where feasible, the productivity of timberlands is restored, enhanced, and maintained. [¶] (b) The goal of maximum sustained production of high-quality timber products is achieved while giving consideration to values relating to recreation, watershed, wildlife, range and forage, fisheries, regional economic vitality, employment, and

---

[8] " 'Timberland' " is defined as "land, other than land owned by the federal government . . . which is available for, and capable of, growing a crop of trees of any commercial species used to produce lumber and other forest products, including Christmas trees." (§ 4526.) The parties do not dispute that the land involved in this controversy is properly categorized as timberland.

aesthetic enjoyment." (See generally, *Sierra Club* v. *State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1226 [32 Cal.Rptr.2d 19, 876 P.2d 505].)

Section 4581 requires that anyone conducting timber operations must first prepare and submit a timber harvesting plan prepared by a registered professional forester. The plan serves the same function as an EIR. (Cal. Code Regs., tit. 14, § 896, subd. (a); see, e.g., Pub. Resources Code, §§ 4582, 4582.3, 4582.6, 4582.7, 4582.8, 4582.9.) "After an applicant submits a [timber harvesting plan], CDF must review it to determine whether it complies with the substantive provisions of the [FPA], with various regulations adopted under the [FPA] [citation], and with applicable portions of the California Environmental Quality Act. [Citations.] [¶] Additionally, other state and county agencies review a [timber harvesting plan], and the public must be provided an opportunity to review and comment on it. [Citation.] CDF is required to consider the recommendations made by other agencies, both state and county, and any input provided as a result of public comment, and to respond thereto." (*Environmental Protection Information Center* v. *Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1011, 1014 [50 Cal.Rptr.2d 892]; see also *Environmental Protection Information Center, Inc.* v. *Johnson* (1985) 170 Cal.App.3d 604, 610-612 [216 Cal.Rptr. 502].)

Once cutting has begun, a timber harvesting plan cannot be canceled except as to lands not harvested. (Cal. Code Regs., tit. 14, § 1043.)

In a related vein, the FPA provides that "[a]ny person who owns timberlands which are to be devoted to uses other than the growing of timber shall file an application for conversion with the board [i.e., the State Board of Forestry (§ 4521.3)]." (§ 4621; see also Cal. Code Regs., tit. 14, § 1103.) A timberland conversion permit is conditioned on the granting of any necessary rezoning or use permits. (§ 4622.) Timber operations cannot begin until the necessary rezoning or use permit is obtained, and the permit is recorded. (*Ibid.*; Cal. Code Regs., tit. 14, § 1103.1, subd. (a).)[9] If a timberland conversion permit is canceled, the land reverts back to timberland and must be restocked. (Cal. Code Regs., tit. 14, § 1107; see Pub. Resources Code, §§ 4561, 4561.3.)

---

[9]The regulations specify that "[n]o timber operations *or other conversion activities* shall be conducted on timberland which is proposed to be converted to a use other than the growing of timber unless a conversion permit has been issued . . . and the permit has been recorded . . . ." (Cal. Code Regs., tit. 14, § 1103.1, subd. (a), italics added.)

 Squaw Valley asserts the court erred in concluding it had violated the FPA when it cut trees without a timber harvesting plan.[10] Specifically, Squaw Valley notes that a timber harvesting plan or a timberland conversion permit is required only if a party is engaged in "timber operations."[11] Because it did not make commercial use of the felled timber, Squaw Valley contends it was not engaged in timber operations and thus the FPA is inapplicable. We conclude otherwise.

The definition of "timber operations" is central to this appeal. As in effect at the time relevant to these proceedings, section 4527 provided: " 'Timber operations' means the cutting or removal or both of timber or other solid wood forest products, including Christmas trees, from timberlands for commercial purposes, together with all the work incidental thereto . . . ."[12] (Stats. 1973, ch. 880, § 4, p. 1617.) At the time of the 1989 tree cutting, the phrase "commercial purposes" was not defined in the statutes or regulations.

Squaw Valley asserts timber is cut for commercial purposes only if the lumber is actually sold. Plaintiffs, on the other hand, contend a party's intent at the time of the cutting controls. In other words, if a party intended to sell the timber when it was cut, the timber was cut for commercial purposes, and it is immaterial whether the sale was ever realized. Plaintiffs have the better argument.

Statutory interpretation presents a question of law, and we therefore interpret section 4527 de novo. (*Loken* v. *Century 21-Award Properties* (1995) 36 Cal.App.4th 263, 270 [42 Cal.Rptr.2d 683].) "The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] 'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning." '

---

[10]Squaw Valley had obtained a timberland conversion permit, but canceled it in early February 1989, after the trees had been cut.

[11]Plaintiffs point out that section 1103.1, subdivision (a), of title 14 of the California Code of Regulations, quoted in footnote 9, *ante*, requires a timberland conversion permit for timber operations "or other conversion activities." They argue that even if Squaw Valley's conduct cannot be characterized as a timber operation, it certainly involved "other conversion activity." Like the trial court, we conclude Squaw Valley engaged in a timber operation, and thus we do not reach this alternative theory of liability.

[12]Section 4527 specified these activities include but are not limited to ". . . construction and maintenance of roads, fuel breaks, firebreaks, stream crossings, landings, skid trails, beds for the falling of trees, and fire hazard abatement, but excluding preparatory work such as treemarking, surveying, or roadflagging. Removal or harvest of incidental vegetation from timberlands, such as berries, ferns, greenery, mistletoe, herbs, and other products, which action cannot normally be expected to result in a threat to forest, air, water, or soil resources, does not constitute timber operations." (Stats. 1973, ch. 880, § 4, p. 1617.) The current version of section 4527 contains virtually identical language.

[Citations.] Although we may properly rely on external aids, we should first turn to the words of the statute to determine the intent of the Legislature. [Citation.] Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) The language of a statute is to be construed according to its usual, ordinary meaning. (*DuBois* v. *Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 388 [20 Cal.Rptr.2d 523, 853 P.2d 978].)

The phrase "cutting . . . for commercial purposes" focuses on intent. The dictionary defines "purpose" as "something set up as an object or end to be obtained: INTENTION." (Webster's Ninth New Collegiate Dict. (1984) p. 957.) By utilizing the phrase "cutting . . . for commercial purposes," the Legislature focused on a party's intent at the time the trees were cut.[13] Had the Legislature been more concerned with the ultimate use of the timber, it could easily have defined "timber operations" as "the sale of cut timber." It did not do so.

Moreover, the definition offered by Squaw Valley conflicts with other provisions of the FPA. For example, section 4602.5, subdivision (b), provides that "[a]n inspecting forest officer may issue a written timber operations stop order if, upon reasonable cause, the officer determines that a timber operation *is being conducted or is about to be conducted* in violation of this chapter or of forest practice rules adopted by the board pursuant to this chapter and that the violation or threatened violation would result in imminent and substantial harm to soil, water, or timber resources, or to fish and wildlife habitat." This statute clearly contemplates a stop order being issued before a cut has begun or during timber felling. A timber operation is deemed to have taken place at that point; the ultimate sale of the lumber is immaterial. To hold otherwise would make this statute a nullity: no stop order could issue until the timber was sold.[14]

The policies underlying the FPA are furthered by focusing on a party's intention at the time the trees are cut rather than when they are sold. A party

[13]As one court commented in dicta, the FPA "requires the preparation and filing of a [timber harvesting plan] by any owner of property upon which timber operations *are contemplated.*" (*Environmental Protection Information Center* v. *Department of Forestry & Fire Protection, supra,* 43 Cal.App.4th at p. 1014, italics added.)

[14]In its reply brief, Squaw Valley offers evidence concerning a "typical" timber operation and asserts that lumber is generally sold before it is cut. No such evidence was adduced at trial. Moreover, the testimony of CDF officials indicated that the Squaw Valley situation was not typical in any respect, and no similar cases had ever been presented. Thus, the characteristics of a "typical" cut are irrelevant.

engaging in a timber operation is required to file a timber harvesting plan, which serves as the functional equivalent of an EIR. This document allows public review and comment, ensures that appropriate alternatives and mitigation measures are considered, and permits input from agencies with expertise in timber resources and conservation. This essential review might not occur if only the ultimate disposition of the timber mattered. For example, a party might cut thousands of trees, intending to sell them, but not file a timber harvesting plan. If the sale ultimately failed to materialize, the trees would be gone without the benefit of any appropriate environmental review. The oversight responsibilities given to CDF and other agencies would thus be illusory.

Squaw Valley contends that the timber harvesting plan here simply duplicated the EIR that had been filed and thus served no special salutary purpose. However, the EIR in question was determined to be inadequate. Squaw Valley cannot rely on a legally insufficient document to avoid the requirement of a proper timber harvesting plan.

■ The trial court properly concluded there was abundant evidence that Squaw Valley cut the trees intending to use them for commercial purposes. By filing a timber harvesting plan and obtaining a timberland conversion permit, Squaw Valley declared its intent to engage in a timber operation. Mott delayed requesting a cancellation of these documents for more than one week after the cut because he was still trying to find a buyer for the timber. These circumstances make it clear that sale of the lumber was more than merely an option: Squaw Valley intended to sell the lumber when it cut down the trees. By cutting the trees for this commercial purpose, Squaw Valley engaged in a timber operation. Its failure to do so in conformity with provisions of the FPA constituted an unlawful business practice.[15]

---

[15]Although the parties limit their argument to the question of whether a timber operation requires an actual sale of lumber or merely the intent to sell, we note the language of the statute permits an entirely different interpretation. Nothing in the statute limits a cutting of timber for commercial purposes to the sale (or intent to sell) of the lumber alone. That is, the clearing of forest land for *any* commercial venture might properly be characterized as cutting for commercial purposes. For example, the clearing of trees for the creation of a ski run at a commercial ski resort can also be considered cutting for commercial purposes.

This broader interpretation is reflected in the current version of section 4527. In response to Squaw Valley's tree cutting spree, the Legislature in 1990 amended this statute to add the following definition: " 'Commercial purposes' includes (1) the cutting or removal of trees which are processed into logs, lumber, or other wood products and offered for sale, barter, exchange, or trade, or (2) the cutting or removal of trees or other forest products during the conversion of timberlands to land uses other than the growing of timber . . . including, but not limited to, residential or commercial developments, production of other agricultural crops, recreational developments, ski developments, water development projects, and transportation projects." We note this definition specifies two examples of "commercial purposes." By

Squaw Valley contends that under principles of statutory construction, the trial court should have deferred to CDF's interpretation of section 4527, namely, that a timber operation occurs only if the lumber is actually sold. This claim fails for several reasons.

■ It is true that "[a]n agency's expertise with regard to a statute or regulation it is charged with enforcing entitles its interpretation of the statute or regulation to be given great weight unless it is clearly erroneous or unauthorized." (*Lusardi Construction Co.* v. *California Occupational Safety & Health Appeals Bd.* (1991) 1 Cal.App.4th 639, 645 [2 Cal.Rptr.2d 297].) "Opinions of the administrative agency's counsel construing the statute are likewise entitled to consideration." (*Rizzo* v. *Board of Trustees* (1994) 27 Cal.App.4th 853, 862 [32 Cal.Rptr.2d 892].) Nevertheless, courts are the ultimate arbiters of the construction of a statute. (*California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2].) An administrative agency cannot alter or enlarge the legislation, and an erroneous administrative construction does not govern the court's interpretation of the statute. (*Rizzo* v. *Board of Trustees, supra,* 27 Cal.App.4th at p. 862; see also *Environmental Protection Information Center* v. *Department of Forestry & Fire Protection, supra,* 43 Cal.App.4th at pp. 1021-1022.)

Squaw Valley misstates the evidence when it suggests CDF officials had a uniform interpretation of section 4527. In fact, officials presented a variety of views. Bob Malain, a former assistant chief at CDF, testified there were no CDF policies to cover a situation of "ambiguous intent" because it had never before occurred. The Squaw Valley situation was novel. However, at his deposition, Malain had stated that a party planning to sell the timber at the time of the cut would be engaged in a timber operation. Although he decided not to prosecute Squaw Valley for violations of the FPA, he based that decision on a report that the deputy district attorney had determined no illegal activity had occurred. In fact, the deputy district attorney had not reached any such conclusion; instead, he had stated that he needed to research the matter further because forestry issues were outside his area of expertise.

stating that commercial purposes "includes" these examples, the statute does not purport to set forth an all-inclusive definition. Because we have concluded that Squaw Valley cut trees for commercial purposes when it felled trees with the intent of selling them, we have no occasion to resolve whether this statutory amendment simply clarified existing law or expanded the scope of the statute.

Although Squaw Valley contends otherwise, the 1992 cutting of trees was for commercial purposes under the 1990 version of this statute. The trees were cut as part of the development of a ski run and were part of the conversion of timberland to recreational uses. Contrary to Squaw Valley's claim, the conversion had not yet been completed when the trees were cut. The adequacy of the EIR was still being litigated and the Silverado lift was not yet operational.

A retired CDF area forester, Richard Schoenheide, testified that he did not believe the FPA came into play unless the felled timber was sold, bartered, or traded. Schoenheide's supervisor, Daniel Scatena, testified there was no policy on the question presented in the Squaw Valley scenario and that any decision as to whether a violation of the FPA had occurred would have to be made on a case-by-case basis. He believed that disposal, not intent, controlled.

Another former CDF official, Robert Paulus, testified that he was unaware of any violations of the FPA based on intent alone, but noted that, in mid-February 1989, CDF was undecided as to whether to prosecute Squaw Valley. The decision not to prosecute was not made until late March or early April.

The former general counsel for CDF, Robert McKechnie, testified he did not believe that proof of actual sale was needed to demonstrate a cut had been made for commercial purposes, and instead could be shown by intent to sell. He said this interpretation reflected CDF policy throughout 1989. McKechnie asserted the use of the phrase "for commercial purposes" in defining "timber operations" necessarily referred to the intent of the person doing the cutting. He pointed out that the bodies regulating timber operations were concerned with the cutting of the timber, not its sale.

In short, there was no one CDF view warranting deferral by the trial court. Officials had various opinions on the meaning of section 4527. The situation presented by the Squaw Valley tree cutting was unique and had never occurred previously. Witness testimony suggested that the lack of a sale might make it difficult to prove a property owner cut the trees for commercial purposes, but such action might nonetheless be a violation of the FPA. Here, however, there was ample evidence of Squaw Valley's intent at the time of the tree cutting.[16]

---

[16]Contrary to Squaw Valley's claim, there is nothing in the handbook or pamphlet prepared by CDF that would indicate that timber operations occur only if the cut timber is sold. Cited sections of these publications discuss the definitions of "commercial harvest" and "noncommercial removal of timber" for purposes of a timberland conversion permit, issues which are at best only peripherally related to the timber harvesting plan requirements for timber operations. In any event, even if we were to conclude otherwise, we would not defer to an administrative interpretation that is contrary to the statute's language. (See *Environmental Protection Information Center* v. *Department of Forestry & Fire Protection*, *supra*, 43 Cal.App.4th at p. 1022.)

■ In a related argument, Squaw Valley asserts the trial court erred in denying its motion to defer to CDF under the primary jurisdiction doctrine.[17] There was no error.

■ As the California Supreme Court explained: "[T]he primary jurisdiction doctrine advances two related policies: it enhances court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise, and it helps assure uniform application of regulatory laws." (*Farmers Ins. Exchange* v. *Superior Court, supra*, 2 Cal.4th at p. 391.) The doctrine applies " 'where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues, which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' " (*Id.* at p. 390, italics omitted.)[18]

The court further explained: "No rigid formula exists for applying the primary jurisdiction doctrine [citation]. Instead, resolution generally hinges on a court's determination of the extent to which the policies noted above are implicated in a given case. [Citations.] This discretionary approach leaves courts with considerable flexibility to avoid application of the doctrine in appropriate situations, as required by the interests of justice." (*Farmer's Ins. Exchange* v. *Superior Court, supra*, 2 Cal. 4th at pp. 391-392, fn. omitted.)

■ Here, the trial court did not abuse its discretion in denying Squaw Valley's motion to defer the matter to CDF under principles of primary jurisdiction. As noted above, there was no uniform view in CDF on the proper interpretation of section 4527. Moreover, as evidence submitted in opposition to Squaw Valley's motion made clear, CDF did not adjudicate disputes concerning the interpretation of the FPA. Questions regarding interpretation of the FPA were referred to CDF's counsel or the Attorney General. In fact, the FPA specifically vests the Attorney General with the authority to bring actions to enforce compliance with the FPA and its related regulations. (§ 4603.) Unlike other agencies, CDF has no " ' "pervasive and self-contained system of administrative procedure" . . .' " to deal with the

[17]Squaw Valley previously sought review of this decision in our court and in the Supreme Court. These efforts were unsuccessful.

[18]Primary jurisdiction differs from the doctrine of exhaustion of remedies in that in the latter case, a claim is cognizable in the first instance solely by an administrative agency. Primary jurisdiction applies when a claim is cognizable in the courts but referral to an administrative agency's expertise is warranted. (*Farmers Ins. Exchange* v. *Superior Court, supra*, 2 Cal.4th at pp. 390-391; *Wolfe* v. *State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 558, fn. 5 [53 Cal.Rptr.2d 878].)

issues raised in this appeal. (*State Farm Fire & Casualty Co.* v. *Superior Court, supra,* 45 Cal.App.4th at p. 1112.) Since the legal interpretation of the FPA is not part of CDF's domain, the doctrine of primary jurisdiction has little relevance.

Finally, we note the basic issue in this appeal involves a question of statutory interpretation, a matter with which courts have considerable experience and which does not necessitate deferral to another agency. (*Southern Cal. Ch. of Associated Builders etc. Com.* v. *California Apprenticeship Council* (1992) 4 Cal.4th 422, 454 [14 Cal.Rptr.2d 491, 841 P.2d 1011].)

As an additional basis for its ruling, the trial court concluded judicial economy would not be served by invoking the doctrine of primary jurisdiction. Squaw Valley did not raise this issue until the eve of trial. By that time, the trial court had already ruled on voluminous cross-motions for summary judgment and had spent what it termed "an extraordinary amount of hours" becoming intimately familiar with the facts of the case and the relevant statutes and regulations. There was no benefit in deferring to CDF under these circumstances.

The trial court did not abuse its discretion in refusing to apply the primary jurisdiction doctrine and stay this action. (*State Farm Fire & Casualty Co.* v. *Superior Court, supra,* 45 Cal.App.4th at p. 1112.)

Squaw Valley raises due process concerns, contending in essence that it should not be penalized for violating a statute that did not give fair notice of the proscribed conduct. This claim is unpersuasive.

In considering whether a statute is sufficiently clear to satisfy the requirements of fair notice, we look first to the language of the statute itself. A statute should be sufficiently clear so that a person may know what is prohibited and what can be done without violating its provisions, but a statute will not be declared void for uncertainty if any reasonable and practical construction can be given to its language. (*Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 143 [253 Cal.Rptr. 1, 763 P.2d 852]; see also *People* v. *Sangani* (1994) 22 Cal.App.4th 1120, 1143 [28 Cal.Rptr.2d 158]; *People* v. *Anderson* (1972) 29 Cal.App.3d 551, 561 [105 Cal.Rptr. 664].)

Here, Squaw Valley cut the trees with the intent to sell the felled lumber. Section 4581 requires a property owner to have a timber harvesting plan before engaging in timber operations. Section 4527 defines "timber operations" as the cutting of trees for commercial purposes. As we have already discussed, there is no question that cutting trees for the purpose of

selling them constitutes a commercial purpose. There is nothing unclear about the FPA statutes or Squaw Valley's conduct. Squaw Valley's due process concerns are chimerical.

In a somewhat convoluted argument, Squaw Valley next contends that because it relied on CDF's advice in withdrawing its timber harvesting plan and timberland conversion permit in February 1989, plaintiffs are estopped from asserting the cutting without an approved plan constituted an unlawful business practice. Squaw Valley errs.

The trial court rejected plaintiffs' claim that the withdrawal of the timber harvesting plan and timberland conversion permit constituted an unlawful business practice. The trial court noted that an estoppel defense could have appropriately been raised had such conduct been the basis for penalties. However, the fact that *after* the cut, CDF urged the withdrawal of the timber harvesting plan and cancellation of the timberland conversion plan has no bearing on Squaw Valley's conduct at the time of the cut. Squaw Valley elected to cut down the trees on January 28-30, 1989. CDF did nothing to encourage those cuts. In fact, it was kept completely ignorant of Squaw Valley's plans. As far as CDF knew, Squaw Valley did not intend to cut the trees until sometime in mid-April as outlined in its plan and permit. CDF was not informed of the cut until January 30.

CDF did nothing to encourage Squaw Valley to cut early, nor did Squaw Valley rely on CDF's advice in choosing to proceed with the cuts nearly three months ahead of schedule. Given the unilateral nature of Squaw Valley's actions, there can be no estoppel. (See generally, *Lentz* v. *McMahon* (1989) 49 Cal.3d 393, 399 [261 Cal.Rptr. 310, 777 P.2d 83].)[19]

In sum, the trial court properly concluded Squaw Valley's violations of FPA provisions constituted unlawful business practices.

### III. *Violations of CUP-974*

The trial court also found Squaw Valley had violated several conditions outlined in CUP-974. Specifically, the court ruled Squaw Valley had violated (1) condition 5, by removing the trees cut in January 1989 to unapproved landing areas; (2) condition 6, by failing to have a registered

---

[19]Squaw Valley insists that had it not followed CDF's advice to withdraw the timber harvesting plan and cancel the timberland conversion permit, it could have received after-the-fact approval for the cut from CDF. There is no evidence to support that claim. Whether CDF would have given such approval is entirely conjectural. Only one instance of postcutting approval was described at trial, and that involved a school that was built without knowledge of the FPA requirements. That situation differs markedly from the commercial venture at issue here, particularly given Squaw Valley's awareness of FPA statutes and regulations, as evidenced by the obtaining and filing of a timberland conversion permit and a timber harvesting plan.

professional forester in attendance during the initial setup of the harvesting activities in January and failing to have a registered forester in attendance at any time during the March cut; (3) condition 10, by failing to obtain the timber harvesting plan and submitting it to the planning department prior to the cut; (4) condition 18A, by failing to post sufficient security in the form of a cash deposit or letter of credit to guarantee reforestation; and (5) condition 12, by cutting outside the approved boundaries in March 1989.

■ On appeal, Squaw Valley does not challenge the sufficiency of the evidence to support each of these findings, but instead contends violations of a conditional use permit cannot be deemed unlawful conduct.[20] We conclude otherwise.

The Planning and Zoning Law of California (Gov. Code, § 65000 et seq.) establishes a local government's authority to regulate the use of land. Of primary importance is the general plan, which serves as a statement of development policies. (*Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176, 1182-1183 [203 Cal.Rptr. 401]; see generally, *Beck Development Co.* v. *Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1195-1200 [52 Cal.Rptr.2d 518].) "Subordinate to the general plan are zoning laws, which regulate the geographic allocation and allowed uses of land. Zoning laws must conform to the adopted general plan. [Citations.] These enactments provide the authority and the criteria for the regulation of land uses. [Citations.]

"Zoning laws regulate land uses in two basic ways. Some uses are permitted as a matter of right if the uses conform to the zoning ordinance. Other sensitive land uses require discretionary administrative approval pursuant to criteria in the zoning ordinance. [Citation.] They require a conditional use permit. [Citation.] The reason for discretionary treatment is that these are uses which 'cannot be said to be always compatible in some zones while always incompatible in others . . . uses that should not be allowed as of course, but could be allowed subject to conditions . . . .' " (*Neighborhood Action Group* v. *County of Calaveras, supra*, 156 Cal.App.3d at p. 1183.)

■ "The 'unlawful' practices prohibited by [Business and Professions Code] section 17200 are any practices forbidden by law, be it civil or

---

[20]In one paragraph, however, Squaw Valley suggests the use of different helicopter landing sites was appropriate, the insufficient letter of credit was the result of an "innocent miscalculation," and the definition of "set-up work" requiring the presence of a registered forester was uncertain. These claims are less than persuasive. Whatever excuses Squaw Valley may offer, overwhelming evidence established violations of CUP-974. Unapproved landing sites were used, the letter of credit failed to take into account the cost of reforestation and no registered forester was present when the January cut was begun or at any time during the March cut.

criminal, federal, state, or municipal, statutory, regulatory, or court-made. [Citation.] It is not necessary that the predicate law provide for private civil enforcement. [Citation.] As our Supreme Court put it, section 17200 'borrows' violations of other laws and treats them as unlawful practices independently actionable under section 17200 et seq." (*Saunders* v. *Superior Court* (1994) 27 Cal.App.4th 832, 838-839 [33 Cal.Rptr.2d 438].)

■■■■ Squaw Valley recognizes that violation of a local ordinance may constitute an unlawful activity, but asserts a conditional use permit does not have the force of law. We disagree for two specific reasons.

First, conditional use permits are part of local zoning laws. They are the mechanism for enforcing zoning ordinances. (See *IT Corp.* v. *Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 93 [2 Cal.Rptr.2d 513, 820 P.2d 1023].) The failure to observe conditions set forth in a permit necessarily involves a violation of zoning laws which allow such activity only if certain conditions are observed. In other words, a violation of a permit's conditions is also a violation of the zoning law, and is therefore unlawful.[21]

Second, section 1.7, subdivision (a), of chapter 1 of the Placer County Code specifically states: "Whenever in this Code, Ordinance, or Regulation, any act is required to be performed, or prohibited, *or is not a permitted use within a zoning district*, . . . and no specific penalty is provided for, the penalty shall be punishment by either a fine not exceeding $2,000 per occurrence, or imprisonment in the County jail for a term not exceeding six months, or by both such fine and imprisonment (misdemeanor), or as an infraction, with a fine not to exceed $1,000 per violation." (Italics added.) This provision expressly makes unpermitted uses unlawful.

Consequently, Squaw Valley's violations of CUP-974 can properly form the basis for a claim of unlawful business activity.

In a variation of a theme discussed previously, Squaw Valley suggests the trial court should not have deemed these violations to be unlawful because the county did not seek to revoke its permit. The county's action or inaction is immaterial. As we have noted, Business and Professions Code section 17205 specifically states: "Unless otherwise expressly provided, the remedies or penalties provided by this chapter are cumulative to each other and to

[21]Chapter 40 of the Placer County Code contains the land use ordinances. Section 102.12 outlines the purposes served by conditional use permits and notes those projects for which such a permit is required. The construction of ski runs and ski trails is one project requiring a conditional use permit. Inherent in the requirement that a permit be issued is the requirement that the conditions of the permit be observed. Any other interpretation renders illusory the protections provided by the permit process.

the remedies or penalties available under all other laws of this state." Nothing in the Placer County Land Use or Zoning Ordinances suggests that remedies for permit violations are limited to those outlined in the county code. Plaintiffs could therefore properly bring an action for unlawful business practices predicated on these violations of the conditional use permit. (*See People* v. *McKale, supra,* 25 Cal.3d at pp. 632-633.)[22]

## IV. *Violation of Temporary Restraining Order*

▬ Squaw Valley contends violation of the TRO issued in this case cannot form the predicate for an unlawful business activity because the TRO was a nullity at the time it was allegedly violated. Squaw Valley further suggests that any violation should have been addressed in contempt proceedings, not in an action for unlawful business practices. Neither contention has merit.

On January 30, 1989, immediately after the trees were cut, the trial court issued an order to show cause and TRO enjoining Squaw Valley from "engaging in or performing directly or indirectly, any and all of the following acts: [¶] Cutting or removing any trees of any size from the area known as Shirley Canyon and subject to general plan amendment GPA-256 and conditional use permit 974, or taking any other actions to construct or implement the project; [¶] and instead requiring [Squaw Valley], its agents, employees, representatives, and each of them, to: [¶] Immediately cease the tree cutting and any other actions to implement the project, until such time, if ever, that the Court orders to the contrary." The matter was scheduled to be heard on March 10, 1989.

On February 16, 1989, the TRO was modified to address concerns related to the removal of the felled trees, and the hearing date of March 10, 1989, was confirmed.

At the same time the unlawful business practices case was proceeding in Judge Garbolino's courtroom, the challenge to the underlying EIR and CUP-974 was underway in Judge Couzens's court. On March 9, 1989, Squaw Valley's attorney wrote to Judge Couzens on a calendaring matter. This letter stated in part: "[We] had previously stipulated to the temporary restraining order so that we would not have to have a hearing on the

---

[22]Squaw Valley recognizes that violations of conditions in a use permit might properly be termed an "unfair" business practice. (See generally, *State Farm Fire & Casualty Co.* v. *Superior Court, supra,* 45 Cal.App.4th at pp. 1103-1104.) Here, however, the court limited plaintiffs' case to allegations of "unlawful" business practices, a ruling challenged by plaintiffs in their protective cross-appeal. Because we affirm the trial court's judgment and dismiss the cross-appeal as moot, we have no occasion to delve further into this issue.

preliminary injunction prior to the March 10th date for the hearing on the Petition [in the EIR case]. Thus, the temporary restraining order was extended beyond the 20 days authorized by the Code of Civil Procedure. We did not ask for a continuance nor have we stipulated to a restraining order beyond March 10. We request that the Court dissolve the existing restraining order. In order to avoid any misunderstandings, we wish to assure the Court and counsel that prior to the hearing in April [on the EIR and the preliminary injunction], the only activity that may take place regarding this project would be the removal of the felled trees from the slopes to the landing areas along the ridge where the other felled trees are stacked. No additional tree cutting will take place during this time because Squaw Valley . . . has completed phase I of the approved tree cutting program and phase II cannot take place until the spring of 1991 pursuant to the County approval."

On March 10, 1989, Judge Garbolino extended the TRO "until the question of whether to issue an injunction may be heard and resolved on April 19, 1989 . . . ."

On March 17, 1989, Squaw Valley cut an additional 18 trees in the disputed area, despite its attorney's previous assurances to the court that such activity would not take place.

Squaw Valley insists that this conduct did not violate the TRO. Citing Code of Civil Procedure section 527, it claims the TRO "had lapsed by operation of law by the time of the cutting on March 17, 1989 because the order lasted for more than twenty days without [Squaw Valley's] consent. . . . Consequently, there could not have been a violation of an order that had become a nullity."

At the time of these proceedings, Code of Civil Procedure section 527, subdivision (a), provided in relevant part: "No preliminary injunction shall be granted without notice to the opposite party; nor shall any temporary restraining order be granted without notice to the opposite party, unless it shall appear from facts shown by affidavit or by the verified complaint that great or irreparable injury would result to the applicant before the matter can be heard on notice and, . . . the applicant or the applicant's attorney certifies to the court under oath (i) that within a reasonable time prior to the application he or she informed the opposing party or his or her attorney at what time and where the application would be made; (ii) that he or she in good-faith attempted to inform the opposing party and his or her attorney but was unable to so inform the opposing party or his or her attorney, specifying the efforts made to contact them; or (iii) that for reasons specified he or she should not be required to so inform the opposing party or his or her attorney.

In case a temporary restraining order shall be granted without notice, in the contingency above specified, the matter shall be made returnable on an order requiring cause to be shown why the injunction should not be granted, on the earliest day that the business of the court will admit of, but not later than 15 days or, if good cause appears to the court, 20 days from the date of the order." (Stats. 1982, ch. 812, § 1, p. 3101.)

It is this 20-day period that Squaw Valley appears to invoke. However, by the statute's express language, that time frame applies only to TRO's issued without notice to the opposing party. That is not the case presented here, nor does Squaw Valley assert that it did not have notice of the hearings on the TRO. In its reply brief, Squaw Valley claims "the concept of 'notice' under § 527 is not satisfied when the defendant is just told when and where plaintiff will apply for relief." But that is precisely the information that former Code of Civil Procedure section 527 outlined in (a)(i) through (iii) in defining a TRO issued without notice. Squaw Valley's claim to the contrary is unavailing.

Squaw Valley also asserts that TRO violations should be handled in contempt proceedings, and not used as a basis for an action for unlawful business practices. We disagree. We reiterate that proceedings under the unfair competition statutes are cumulative to other possible remedies or penalties (Bus. & Prof. Code, § 17205), and violations of a TRO may therefore be prosecuted as an unlawful business practice. (*Saunders* v. *Superior Court, supra,* 27 Cal.App.4th at pp. 838-839; see *People* v. *Toomey* (1985) 157 Cal.App.3d 1, 17-18 [203 Cal.Rptr. 642].)

Equally unavailing is Squaw Valley's claim that procedural safeguards associated with contempt proceedings will be ignored in a prosecution for unlawful business practices. Stale claims cannot form the basis for a unlawful business practice, as an action under the unfair competition statute must be brought within four years of the wrongful conduct (Bus. & Prof. Code, § 17208). If a violation of a TRO is alleged as an unlawful business practice, the full procedural protections of a trial will come into play. Cases Squaw Valley cites describing other problems presented in contempt proceedings, such as *In re Blaze* (1969) 271 Cal.App.2d 210 [76 Cal.Rptr. 551], are simply inapposite. Squaw Valley was not found to be in contempt; it was found to have engaged in unfair competition by committing unlawful business practices.

Although Squaw Valley does not contend otherwise, we note that the evidence amply supports the trial court's determination that Squaw Valley violated the TRO. Mott, the president and general manager of Squaw Valley,

ordered the cutting of trees on March 17, 1989, while the TRO prohibiting such activity was in effect. Squaw Valley's characterization of this action as "regrettable" is a gross understatement. It was also an unlawful business practice.

## V. *Remedies Imposed*

Upon finding Squaw Valley had committed a variety of unlawful business practices, the trial court ordered a variety of remedies. The court imposed monetary penalties totaling $223,000, and ordered mandatory and prohibitory injunction relief. On appeal, Squaw Valley raises several challenges to this order. We discuss each in turn.[23]

## A. *Monetary Penalties*

Business and Professions Code section 17206, subdivision (a), provides every person who has engaged in unfair competition "shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation[.]" (All subsequent statutory references in part V of this opinion are to the Business and Professions Code unless otherwise indicated.)

■ Plaintiffs sought monetary penalties in excess of $4.5 million, calculated at $2,500 per tree removed. The trial court concluded ". . . such a penalty would be excessive in light of the conduct which is apparent before this court along with the other remedies imposed herein." Instead, the court ordered penalties of $223,000 as follows:

"1. Use of unapproved landing areas: Two violations, $2,500 each, for a total of $5,000.

"2. Failure to have [a registered professional forester] at initial harvesting: One violation $2,5000, for a total of $2,500.

"3. Failure to provide approval of CDF prior to cutting: One violation, $2,500 for a total of $2,500.

"4. Failure to provide letter of credit for reforestation: One violation, $500, for a total of $500.

---

[23]We reiterate that in its statement of decision, the trial court expressly stated that if these remedies were determined to be improper, different remedies would have been imposed "to conform to that which may subsequently be deemed permissible. In particular, [if it] is subsequently determined on appeal that the injunctive relief granted herein is unwarranted or unavailable, this court would have imposed substantially higher monetary sanctions. Conversely, should the monetary sanctions prove to be impermissible in the amounts imposed, then a greater scope of injunctive relief would have been considered."

"5. March [1989] cut: Eighteen violations, $2,500 each, for total of $45,000.

"6. 1992 cuts: One violation comprising all acts in cutting trees, $2,500 for a total of $2,500.

"7. The January [1989] Cut: . . . The court assesses $125 per violation for 1320 violations, for a total of $165,000."

Presenting a skewed view of the evidence to minimize its wrongdoing, Squaw Valley contends these penalties are excessive. We are unpersuaded.

Section 17206, subdivision (a), requires a court to impose a penalty for each unlawful business practice committed. However, the amount of the penalty lies within the court's discretion. (*People* v. *Custom Craft Carpets, Inc.* (1984) 159 Cal.App.3d 676, 686 [206 Cal.Rptr. 12].)

Here, the penalties imposed were modest in light of Squaw Valley's egregious behavior. The trial court imposed less than the maximum $2,500 per violation in several cases, did not impose a separate fine for Squaw Valley's failure to have a registered forester on the scene in March 1989, and counted the 1992 cut as only one violation. There was no abuse of discretion in ordering $223,000 in monetary penalties.[24]

### B. *Mandatory Injunctive Relief*

In its judgment, the trial court ordered Squaw Valley to take several actions. In part, the court ordered: "In the event that Placer County refuses to grant a Use Permit and zoning change to allow the Tram Basin Bowl to be used to its fullest extent for downhill skiing, [Squaw Valley] is ordered to restock, revegetate and reforest the unlawfully cut area in conformity with the Forest Practices Act. The court specifically retains jurisdiction of this portion of its judgment in order to effect this provision."[25]

Squaw Valley asserts this order is invalid for two reasons. In its opening brief, Squaw Valley contends "[a]n order for reforestation, in advance of a

---

[24]Squaw Valley also asserts the trial court could not both impose monetary penalties and award attorney fees. We defer our discussion of this claim to our analysis of the attorney fees issue.

[25]The court also ordered Squaw Valley to (1) remove all sawed logs from a watercourse, (2) remove all logs and slash located in specified log deposit areas, (3) develop and implement an appropriate reforestation and revegetation plan to meet the requirements of CUP-974, (4) restore the scenic beauty of the area by removing logs and slash, repairing and restoring log deposit areas, and flush cutting any stumps, and (5) deposit an appropriate letter of credit to guarantee reforestation efforts.

decision by the County, is to grant relief in connection with issues not before the court and to intrude on an issue properly left, initially, to County land use analysis." In its reply brief, Squaw Valley takes a different approach and asks us to strike the order mandating reforestation because Placer County has, in fact, issued a new use permit for the area.

No action by this court is now required. By its own language the court's order to restock, revegetate and reforest the area was effective only if Placer County did not amend the zoning and issue a new use permit. Placer County in fact took these steps. This portion of the court's order is moot by its own terms, and we need not amend the judgment.

## C. *Prohibitory Injunctive Relief*

Plaintiffs sought a permanent injunction prohibiting any further development in the "Phase II" area north of the Silverado lift. At trial, Alexander Cushing testified that he was interested in developing additional ski trails in this area, ostensibly for safety reasons. As the trial court noted, no previous EIR's had mentioned that such trails might be necessary. The court suggested Squaw Valley had previously used "safety concerns" as a pretext for development of the Silverado area, which had previously been described as a unique "through the trees" run for expert skiers. The court commented: "Upon obtaining approvals for the lift construction, [Squaw Valley] then advanced safety concerns as one of the primary reasons for cutting the very trees which previously would have provided the unique skiing experience."

In its statement of decision, the court stated: "[I]t is important that [Squaw Valley] not jeopardize environmental resources still within [its] control. It is apparent that the protection of the planning laws and authority of the planning authorities have been insufficient to prevent [Squaw Valley] from taking the actions it has in this case. It is finally important that any future expansion into environmentally sensitive areas be limited to those which will not upset the ecological balance, and which will not destroy what is still a magnificent and beautiful scenic asset."

The trial court therefore ordered prohibitory injunctive relief in paragraph 3 of its judgment as follows:

"a. The court hereby orders that the area of land covered by the preliminary injunction issued on December 16, 1993 . . . (hereinafter referred to as the 'Permanent Injunction Area') shall, except as provided in subparagraph 3.b. following, constitute a zone free from further development in any manner. This injunction requires [Squaw Valley] to allow the Permanent Injunction Area to which it relates to remain in its natural state.

"b. That portion of the Permanent Injunction Area which is covered by 'Phase I,' as cut by [Squaw Valley] . . . (hereinafter referred to as the 'Phase I area'), including the Silverado lift itself, and the adjoining ski runs, shall not be affected by the foregoing prohibition against development. However, no activities relating to operation of the ski lift or maintenance of the ski runs shall be conducted unless specific authorization for those activities, along with the appropriate permits to be issued, are granted by the appropriate Placer County authorities.

"c. Except as specifically allowed in this paragraph, the court hereby enjoins any tree cutting ('tree,' as defined herein means any tree growth whatsoever, including seedlings) in the Permanent Injunction Area. In the Phase I Area, no tree, including 'hazard' trees, may be cut without the permission of the Placer County Planning Department [or without complying with the FPA, its rules or regulations]. The application must be made at least 30 days prior to the planned approval. Said application shall be served upon counsel for the plaintiffs. Outside the area covered by Phase I, [Squaw Valley] shall not remove any tree without specific permission granted by this court. If, for some reason *not related to development*, [Squaw Valley] wishes to remove a tree or trees in such area, application shall be made to this court for permission to do so. The application must be made at least 30 days prior to the planned removal. Said application shall be served upon the Placer County Planning Department, and upon counsel for the plaintiffs. The court shall have the power to allow such cutting on an ad hoc basis, as may be equitable (e.g., public safety)." (Italics in original, fn. omitted.)[26]

Squaw Valley raises several specific challenges to this order, asserting the injunctive relief (1) intrudes on the county's right to regulate land use, (2) requires inappropriate ongoing judicial supervision over cutting of vegetation, (3) is unrelated to the proven violations, (4) impairs the property rights of persons who have not been made parties to this case, and (5) violates section 17206, which permits only monetary penalties, not penalties restricting property. None of these claims is persuasive.

Section 17203 authorizes injunctive relief for violations of the unfair competition law. This statute provides in part: "The court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

---

[26]The court explicitly made these prohibitions applicable to Squaw Valley, "its officers, agents, employees, representatives, attorneys, heirs, assigns, all persons acting on its behalf, and all persons acting in concert or participating with it, and each of them."

 The remedial power granted under this section is "extraordinarily broad. Probably because . . . unfair business practices can take many forms, the Legislature has given the courts the power to fashion remedies to prevent their 'use or employment' in whatever context they may occur." (*Consumers Union of U.S., Inc.* v. *Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963, 972 [6 Cal.Rptr.2d 193].) This power "necessarily includes the authority to make orders to prevent such activities from occurring in the future. While an injunction against future violations might have some deterrent effect, it is only a partial remedy since it does not correct the consequences of past conduct. [Citation.] An 'order which commands [a party] only to go and sin no more simply allows every violator a free bite at the apple.' [Citation.]" (*Id.* at p. 973.) Injunctive relief "may be as wide and diversified as the means employed in perpetration of the wrongdoing." (*People* v. *Casa Blanca Convalescent Homes, Inc.*, *supra*, 159 Cal.App.3d at p. 536.)

We address each of Squaw Valley's claims in light of this broad authority. Squaw Valley raises a separation of powers argument, contending the court's order for injunctive relief intrudes on the county's right to regulate land use. We disagree.

A similar separation of powers argument was rejected in *Consumers Union of U.S., Inc.* v. *Alta-Dena Certified Dairy*, *supra*, 4 Cal.App.4th at pages 974-975. In that case, the defendant dairy committed numerous violations of the unfair competition statute. One of the remedies fashioned by the trial court was injunctive relief ordering the dairy to disclose the dangers of raw certified milk by placing warning labels on its products and advising of these dangers in its advertising. (*Id.* at pp. 970-971.) On appeal, the dairy asserted that ". . . the regulation of businesses in an attempt to safeguard the public health is traditionally a legislative function," and that "in ordering it to place a warning on its products, the trial court unconstitutionally exercised legislative powers in violation of the separation of powers clause in the California Constitution." (*Id.* at p. 974.)

The appellate court rejected this argument, noting the separation of powers doctrine was designed to prevent one branch of government from exercising the complete power vested in another branch. The doctrine does not preclude one branch from taking action properly within its sphere that has the incidental effect of duplicating a function or procedure of another branch. (*Consumers Union of U.S., Inc.* v. *Alta-Dena Certified Dairy*, *supra*, 4 Cal.App.4th at p. 974.) The court concluded: "Here, the primary purpose of the unfair competition law and the false advertising act is to protect the public from unscrupulous business practices. The mere fact that in carrying out this function, as for example by mandating the placement of a warning

on a consumer product, a court may incidentally duplicate a legislative function does not result in a violation of the separation of powers doctrine." (*Id.* at p. 975.) The same reasoning applies here.

As we have noted several times earlier in this opinion, remedies under the unfair competition statute are cumulative. (§ 17205.) Squaw Valley repeatedly insists that the trial court should defer to other agencies—CDF, the planning commission, and/or the county—to address the alleged violations. Statutes and case law compel a different conclusion, as we have already explained. The trial court properly exercised its discretion in fashioning injunctive relief to meet the needs of this particular case.

■ Citing cases such as *Stanton* v. *Singleton* (1899) 126 Cal. 657 [59 P. 146], Squaw Valley next contends the court's order is inappropriate because it requires ongoing supervision over the cutting of vegetation. The burden of supervision in this case is minimal. Squaw Valley must get approval from the court when it wishes to cut vegetation in any part of the phase II area.[27] Presumably, any such cutting will not be a daily occurrence or otherwise require a significant amount of the court's time. This case is therefore unlike *Stanton* in which the Supreme Court noted ". . . a court will not undertake to frame a decree of specific performance where it involves a continuous and long series of acts of supervision requiring special knowledge and skill, and repeated examinations and new directions." (*Id.* at p. 665.) In *Stanton*, the trial court would have had to supervise the development of mining property, evaluate the manner in which in which work was done, and supervise the building of a mill, all work clearly requiring extensive investigations and oversight in areas requiring specialized judgment and skills. (*Id.* at pp. 666-667.)

The instant case is not remotely comparable. A trial court rendering an equitable decree may reserve jurisdiction to take steps to carry it into effect. (*Estes* v. *Rowland* (1993) 14 Cal.App.4th 508, 536 [17 Cal.Rptr.2d 901].) The trial court did not err in requiring Squaw Valley to seek court approval before cutting any vegetation in the Phase II area.

■ Squaw Valley next contends the injunctive relief is unrelated to the proven violations. Nothing could be further from the truth. The record is replete with evidence of Squaw Valley's complete disregard for procedures designed to protect the environment and forest resources. Its focus was on developing a ski run for the Silverado lift as quickly as possible, without

---

[27]If the court wrongfully withholds its permission, Squaw Valley may seek the appropriate remedy at that time. (See *Hernandez* v. *Stabach* (1983) 145 Cal.App.3d 309, 317 [193 Cal.Rptr. 350].)

regard to permit requirements or court orders. The fact that a hearing was pending on an injunction to preclude further cutting spurred Squaw Valley to advance its plans and fall a large number trees. One employee overheard Alexander Cushing, Squaw Valley's owner, approve the January 1989 tree cutting by saying, "What are they going to do, make us replant them?"

Squaw Valley's cavalier attitude led to the cutting of more than 1,800 trees, many of them hundreds of years old, without the proper FPA permits, without a valid EIR, and without an approved use permit. Any subsequent action by the county to rezone a portion of this land and issue a use permit cannot justify Squaw Valley's initial and continuing disregard for the proper legal process.[28]

At trial, Cushing testified that he would like to develop additional trails in the phase II area to link different areas together. Given Squaw Valley's past history and disdain for procedural requirements, the trial court was properly concerned that Squaw Valley might well once again decide to develop these runs without obtaining the necessary permits, severely harming an environmentally sensitive area. As the court aptly noted, "It is apparent that the protection of the planning laws and authority of the planning authorities have been insufficient to prevent [Squaw Valley] from taking the actions it has in this case." "The evidence showed breaches of the law, the regulations and flagrant misconduct which was continued and repeated." (*People* v. *Casa Blanca Convalescent Homes, Inc.*, supra, 159 Cal.App.3d at pp. 535-536.) The injunctive relief ordered by the court protects the environment and forest resources from any future cavalier and unlawful actions.[29] (See *United States* v. *Akers* (9th Cir. 1986) 785 F.2d 814, 823; *San Joaquin Raptor/ Wildlife Rescue Center* v. *County of Stanislaus*, supra, 27 Cal.App.4th at pp. 741-742; *People* v. *Toomey*, supra, 157 Cal.App.3d at p. 21.) Squaw Valley's actions destroyed an irreplaceable natural treasure without the benefit of proper environmental review. While that land obviously cannot be returned to its precut state, the injunctive relief ensures that similar land will not be similarly decimated. The injunction is eminently related to the proven violations.

---

[28]As one court pointed out: "[I]t is all too likely that if [preliminary activities] proceed pending preparation of an adequate EIR, momentum will build and the project will be approved, no matter how severe the environmental consequences identified in the new EIR. . . . [Once activity proceeds beyond the planning stages], change will be both more difficult to effect and less likely to occur." (*San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus* (1994) 27 Cal.App.4th 713, 742 [32 Cal.Rptr.2d 704].) Similarly, once trees are cut down, the damage is done and it is too late to address most of the environmental concerns.

[29]Section 17207 provides additional incentives for compliance. Under subdivision (a) of that statute, a person who intentionally violates any injunction issued pursuant to section 17203 is liable for a civil penalty of up to $6,000 for each violation.

Squaw Valley contends the injunction impairs the property rights of persons who have not been made parties to this case, an argument predicated on a claim that portions of the Phase II area are owned by parties other than Squaw Valley. Squaw Valley's concern is unwarranted.

Initially, we note that the role of other parties was only briefly alluded to at trial. No evidence was presented at trial as to what other parties owned what land, nor did Squaw Valley ever raise the claim it now tenders. The matter is therefore not cognizable on appeal. (*Jermstad* v. *McNelis* (1989) 210 Cal.App.3d 528, 538 [258 Cal.Rptr. 519].)

However, even were we to deem this issue to be properly before us, we would nonetheless conclude it is meritless. The court's injunction applies only to Squaw Valley, "its officers, agents, employees, representatives, attorneys, heirs, assigns, all persons acting on its behalf, and all persons acting in concert or participating with it . . . ." It does not affect any independent third parties. Squaw Valley's concern is unfounded.

Finally, Squaw Valley contends the injunction violates section 17206, which permits only monetary penalties, not penalties restricting property. This claim misses the mark. The trial court ordered injunctive relief pursuant to section 17203, not section 17206. Section 17206 is irrelevant.

In summary, the injunctive relief ordered by the trial court represented an appropriate response to the egregious conduct and disdainful attitude exhibited by Squaw Valley. The court did not abuse its discretion in fashioning such a remedy.

## VI. *Award of Attorney Fees*

Squaw Valley asserts the trial court erred in awarding attorney fees to plaintiffs William Hewlett and the Sierra Club under the Private Attorney General Doctrine of Code of Civil Procedure section 1021.5. (All subsequent statutory references in this part are to the Code of Civil Procedure unless otherwise indicated.)[30] This claim is unpersuasive.

"To obtain an award of fees under section 1021.5, one must be a successful party in an action resulting in the enforcement of an important

---

[30]Section 1021.5 provides in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

right affecting the public interest. A significant benefit, whether pecuniary or nonpecuniary, must have been conferred on the general public or a broad class of persons, and the necessity and financial burden of private enforcement must transcend the litigant's personal interest in the controversy. [Citations.]

" 'Whether a party has met the requirements for an award of fees and the reasonable amount of such an award are questions best decided by the trial court in the first instance. [Citations.] That court, utilizing its traditional equitable discretion, must realistically assess the litigation and determine from a practical perspective whether the statutory criteria have been met. [Citation.] Its decision will be reversed only if there has been a prejudicial abuse of discretion. [Citation.] To make such a determination we must review the entire record, paying particular attention to the trial court's stated reasons in denying or awarding fees and whether it applied the proper standards of law in reaching its decision.' [Citation.]" (*Crawford* v. *Board of Education* (1988) 200 Cal.App.3d 1397, 1405-1406 [246 Cal.Rptr. 806].)

 Squaw Valley contends the trial court cannot award attorney fees under section 1021.5 if it has also awarded penalties for violations of the unfair competition statute. Squaw Valley posits that it was the Placer County District Attorney who initially brought the action, thereby making monetary penalties a possible remedy. (See Bus. & Prof. Code, § 17206.) Asserting that outside counsel in this case was merely doing work on behalf of the district attorney, Squaw Valley claims attorney fees are inappropriate because "the public benefit fee doctrine has never been applied as a subterfuge by which public bodies make private defendants pay for legal work done on behalf of the public body." Alternatively, Squaw Valley asserts that if the case was truly brought by the private parties and not the district attorney, the penalties imposed were inappropriate. This analysis is faulty.

Numerous cases have awarded both penalties and attorney fees. (See, e.g., *Consumers Union of U.S., Inc.* v. *Alta-Dena Certified Dairy, supra,* 4 Cal.App.4th at p. 971; *Committee to Defend Reproductive Rights* v. *A Free Pregnancy Center* (1991) 229 Cal.App.3d 633, 636 [280 Cal.Rptr. 329].) The question is not whether both fees and penalties can, as a matter of law, be awarded in the same action. Instead, it is whether penalties and fees are appropriate in a particular instance. We have already addressed the question of penalties. We turn to the issue of attorney fees.

The dispute here centers on the question of whether private enforcement was necessary. This factor " ' "looks to the adequacy of *public* enforcement and seeks economic equalization of representation in cases where private

enforcement is necessary." ' " (*City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287, 1299 [255 Cal.Rptr. 704], italics in original.)

 A privately enforced action against individual defendants may be deemed "necessary" for purposes of section 1021.5. Due to the burdens imposed on public agencies, adequate government enforcement of the laws is not always possible, making private action imperative. (*Committee to Defend Reproductive Rights* v. *A Free Pregnancy Center*, *supra*, 229 Cal.App.3d at pp. 639-640.) As one court noted: "[S]ection 1021.5 does not proscribe payment of attorney fees to private plaintiffs who successfully initiate and try a private lawsuit for the public benefit *solely* because the People have initiated a similar action which is consolidated for trial with that brought by such plaintiff[s]." (*Id.* at p. 643, italics in original.)

"The trial court, in considering fee awards to private litigants on the facts and record applicable to each particular case, must carefully walk the line between unreasonably transmuting section 1021.5 into an unwarranted cornucopia of attorney fees for those who intervene in, or initiate litigation against, private parties under the guise of benefiting the public interest while actually performing duplicative, unnecessary, and valueless services, and providing appropriate compensation under that statute in cases where the colitigating private party does render necessary, significant services of value and benefit to the public." (*Committee to Defend Reproductive Rights* v. *A Free Pregnancy Center*, *supra*, 229 Cal.App.3d at pp. 643-644.) The instant case is an example of the latter situation.

 The trial court concluded that although the case was "overtried" and the fees sought by Hewlett and Sierra Club were excessive, the case "was beyond the capabilities of the Placer County District Attorney to prosecute, and . . . outside counsel was necessary." The court therefore awarded $480,000 in attorney fees to Hewlett and $192,000 to Sierra Club.

There was no abuse of discretion in making such an award. In their motions for attorney fees, counsel for Hewlett and the Sierra Club outlined their involvement in the case. The Placer County Deputy District Attorney submitted declarations stating that the scope of this litigation was simply too much for his office to handle, and that full-time prosecution of this case would have made prosecution of other offenses impossible. Primary responsibility for litigation was therefore given to Hewlett's attorney.[31] Attorneys for the Sierra Club, who had been involved in the earlier litigation against

---

[31]The characterization of necessity offered by a colitigating party is not binding on the court. (*Committee to Defend Reproductive Rights* v. *A Free Pregnancy Center*, *supra*, 229 Cal.App.3d at p. 644.) However, the instant case does not involve private parties who brought

Squaw Valley, provided expertise in land use and forestry law, as well as the historical and factual background knowledge necessary to prosecute the case efficiently. Attorneys for all three parties attended trial and conferred on trial strategies.

Under these circumstances, the trial court did not abuse its discretion in awarding attorney fees under section 1021.5.

## VII. *Cross-appeal*

Plaintiffs filed a protective cross-appeal asserting the trial court erred in (1) prohibiting further amendment of their complaint, and (2) directing a partial verdict in Squaw Valley's favor. Because we have affirmed the judgment of the trial court, we have no occasion to address these issues and therefore dismiss plaintiffs' cross-appeal as moot.

## DISPOSITION

The judgment is affirmed. Plaintiffs' cross-appeal is dismissed as moot. Plaintiffs shall recover their costs on appeal. Plaintiffs Hewitt and Sierra Club are awarded their reasonable attorney fees on appeal in an amount to be determined by the trial court. (See *Serrano* v. *Unruh* (1981) 32 Cal.3d 621, 637-638 [186 Cal.Rptr. 754, 652 P.2d 985].)

Sims, J., and Davis, J., concurred.

---

an action that was "opportunistic or collusive and undertaken simply to generate such attorney fees." (*Ibid.*) The trial court properly concluded the involvement of plaintiffs Hewlett and Sierra Club was in fact necessary to the successful prosecution of this case.